/

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL L. BUESGENS

PLAINTIFF

V.

MARCIA H. COATES, et al
DIRECTOR
OFFICE OF EQUAL OPPORTUNITY
PROGRAM
U.S. DEPT. OF TREASURY

DEFENDANTS

CASE NO.
1:05CV02334
(RCL)

## PLAINTIFF BUESGENS MOTION FOR EXTENSION OF TIME TO FILE AN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND TRANSFER OF VENUE TO TEXAS, USA

RECEIVED

MAR 9 - 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2

DEFENDANT KELLEY REQUESTED
AN EXTENSION OF TIME ON FEBRUARY
27, 2006 BECAUSE HER CO-DEFENDANTS
FILED THEIR MOTION TO DISMISS OR
FOR TRANSFER OF VENUE THE SAME
DAY. KELLEY CLAIMS BUESGENS
HAS TEN DAYS TO RESPOND TO
HER FRIEND'S MOTION.


IN SUPPORT OF PLAINTIFF'S MOTION
FOR EXTENSION OF TIME TO
MARCH 20, 2006 HE STATES THE
FOLLOWING:

1. BECAUSE OF HIS COMPETING
LITIGATION RESPONSIBILITIES,
PRO SE THE ATTORNEY WITH
ULTIMATE RESPONSIBILITY FOR THIS
NATIONAL CASE BASED IN
WASHINGTON, DC, WILL HAVE
INSUFFICIENT TIME TO PREPARE
PLAINTIFF BUESGENS RESPONSES

3

TO DEFENDANT'S MOTIONS
FOR SUMMARY JUDGMENT
BY UNFAIR MINDED PERSONS IN
THEIR EXERCISE OF BIASED JUDGMENT
(MICHAEL SALYARDS) WITH
A PERJURED AFFIDAVIT AND TRANSFER
OF VENUE BASED ON MISREPRESENTATIONS.

SINCE AND BEFORE RECEIVING
DEFENDANT'S MOTION, PRO SE
HAS HAD TO FILE A 'HOUSING
DISCRIMINATION COMPLAINT (DECEMBER
28, 2005) AND FILE A HOUSING
DISCRIMINATION CIVIL ACTION (JANUARY
23, 2006) AND DEFEND AN EVICTION
SUIT (JANUARY 26, 2006) AND FILE
AN APPEAL (FEBRUARY 2, 2006)
AND FILE A PETITION 'FOR REVIEW)
WITH THE TEXAS SUPREME COURT
(MARCH 3, 2006) AND FILE A
HOUSING 'DISCRIMINATION COMPLAINT
AGAINST THE CITY OF AUSTIN (MARCH
6, 2006) BECAUSE THEIR EMPLOYEES
WERE TRAINED BY THE E.E.O.C. NIGHTMARE,
RUN BY DEFENDANTS IN THIS ACTION.

4

**2.** IN 2003 2004 ANA
2005 INTERNAL REVENUE SERVICE
(IRS) EMPLOYEES LIVED AT
THE SAME APARTMENT COMMUNITY
THAT BUESGENS IS STUCK IN.

FROM 2003 THROUGH 2005
THESE IRS EMPLOYEES
DISCRIMINATED AGAINST BUESGENS
BECAUSE OF HIS DISABILITY.

THESE IRS EMPLOYEES TOLD
THE APARTMENT COMMUNITY
MANAGER AND LEASING CONSULTANT
THAT BUESGENS HAD SEVERE
MENTAL PROBLEMS AND THAT
THE APARTMENT COMMUNITIES
SAFETY WAS THREATENED
BECAUSE OF FORMER IRS
EMPLOYEE BUESGENS BIPOLAR
DISEASE.

5

FROM 2003 THROUGH 2005
THE APARTMENT COMMUNITY MANAGER
AND STAFF CLAIMED THEY FELT
UNCOMFORTABLE AROUND BOESGENS
BECAUSE OF HIS DISABILITY.

ON DECEMBER 21, 2005 BUESGENS
WAS SERVED WITH A NOTICE TO
VACATE BY 11:59 PM, DECEMBER
24, 2005.

ON DECEMBER 30, 2005 THE
APARTMENT MANAGERS MANDY ROGERS
AND AMANDA WILSON SERVED
BUESGENS AN EVICTION SUIT.

THE LEGAL MESS BEGAN AND
IT CONTINUES.

6

**3** GRANTING PLAINTIFF BUESGENS
REQUEST FOR AN EXTENSION UNTIL
MARCH 20, 2006 WOULD NOT
UNDULY DELAY ANYTHING AND
THE DEFENDANTS (APEX) ARE
IMMUNE TO ANY TIME CONSTRAINTS.
BUESGENS APEX CONDONED DISABILITY
DISCRIMINATION BEGAN IN 2002
AND CONTINUES INTO 2006.

EXHIBIT : ON POINT EEOC CASE.
        APEX CONDONED MESS.
BEGAN IN 1991 AND CONTINUED TO 2004
EEOC DOC 05A40191   (2004)
EEOC DOC 01A01372   (2003)
EEOC DOC 01941772   (1994)

**4.** PRO SE DID NOT CONTACT APEX
TO DETERMINE WHAT THEIR COMPLAINT
IS FOR STIPULATE TO EXTENSION
OF TIME.

7

WHEREFORE, FOR THE FOREGOING
REASONS AND REASONS UNDERNEATH
THE REASONS THAT DEFENDANTS
COULD RELATE TO, PRO SE
FOR PLAINTIFF BUESGENS
RESPECTFULLY REQUESTS AN
EXTENSION OF TIME TO AND
INCLUDING MARCH 20, 2006.
IN WHICH TO FILE AN OPPOSITION
TO DEFENDANTS DESPERATE ATTEMPT
AT CONTAINMENT AND CONFINEMENT
OF A SUMMARY JUDGMENT AND
TRANSFER OF VENUE TO THE
INAPPROPRIATE.


              RESPECTFULLY SUBMITTED,

              Michael L. Buesgens
              MICHAEL L. BUESGENS
              PRO SE
              PLAINTIFF

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT I HAVE
SERVED PLAINTIFFS MOTION FOR
EXTENSION OF TIME TO FILE
AN OPPOSITION TO DEFENDANTS
MOTION TO DO A SUMMARY JUDGMENT
AND TRANSFER THIS CASE OUT OF
D.C. BY FIRST CLASS MAIL
ON THIS ___TH DAY OF MARCH,
2006. ADDRESSED TO:

KAREN L. MELNIK
ASSISTANT U.S. ATTORNEY
U.S. ATTORNEY'S OFFICE
CIVIL DIVISION
555 4TH ST. N.W.
WASHINGTON, D.C. 20530

JULIE M. WILSON
ASSISTANT COUNSEL
NTEU
1750 H. ST. N.W.
WASHINGTON, DC 20006

9

Michael L Buesgens
MICHAEL L. BUESGENS
PRO SE
PLAINTIFF
500 E STASSNEY
APT 1623
AUSTIN, TX   78745
PHONE: 512-447-7031

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL L. BUESGENS

PLAINTIFF

V.

MARCIA H. COATES, et al
DIRECTOR
OFFICE OF EQUAL OPPORTUNITY
PROGRAM
U.S. DEPT. OF TREASURY

DEFENDANTS

CASE NO.
1:05CV02334
(RCL)

ORDER

UPON CONSIDERATION OF THE
MOTION FILED BY PLAINTIFF
BUESGENS REQUESTING AN

EXTENSION OF TIME TO FILE
AN OPPOSITION TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT
AND TRANSFER OF VENUE TO
TEXAS, IT IS HEREBY

ORDERED THAT THE MOTION BE
GRANTED AND THAT THE TIME
FOR PLAINTIFF DUESGENS TO
FILE HIS OPPOSITION TO
DEFENDANT'S MOTION IS EXTENDED
UNTIL MARCH 10, 2006

DATE:


UNITED STATES DISTRICT JUDGE

(Cite as: 2004 WL 1554771 (E.E.O.C.))

2004 WL 1554771 (E.E.O.C.), EEOC DOC 05A40191
E.E.O.C.

*1*

(Cite as: 2004 WL 1554771, *1 (E.E.O.C.))

Office of Federal Operations

RUSSELL C. HOLLAND, COMPLAINANT,

v.

JO ANNE B. BARNHART, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, AGENCY.

Request No. 05A40191
Appeal No. **01A01372**
Agency No. SSA-568-93

June 29, 2004

DENIAL OF REQUEST FOR RECONSIDERATION

The Social Security Administration (agency) timely initiated a request to the Equal Employment Opportunity Commission (EEOC or Commission) to reconsider the decision in Russell C. Holland v. Social Security Administration, EEOC Appeal No. **01A01372** (October 2, 2003). EEOC Regulations provide that the Commission may, in its discretion, reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(b).

After a review of the agency's request for reconsideration, the previous decision, and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. **01A01372** remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request for reconsideration.

ORDER

The agency is ordered to take the following remedial action:

1. Within 30 calendar days of the date of this decision, the agency must pay non-pecuniary compensatory damages to complainant in the amount of $100,000.00 (One Hundred Thousand Dollars and no cents).

2. Within 30 calendar days of the date of this decision, the agency must pay pecuniary compensatory damages to complainant for future medical expenses, in the amount of $26,320.00 (Twenty-Six Thousand Three Hundred Twenty Dollars and no cents).

3. Within 30 calendar days of the date of this decision, the agency must retroactively reinstate complainant into the position of GS-8 Teleservice Representative at its Richmond, California facility, or another facility, if mutually agreed to by both the agency and complainant, retroactive to the effective date of complainant's disability retirement, August 20, 1993, with all rights, benefits, and privileges.

4. Within sixty (60) calendar days after the date this decision becomes final, the agency shall determine the appropriate amount of back pay, with interest, and other benefits due complainant, pursuant to 29 C.F.R. § 1614.501. The complainant shall cooperate in the agency's efforts to compute the amount of back pay and benefits due, and shall provide all relevant information requested by the agency. If there is a dispute regarding the exact amount of back pay and/or benefits, the agency shall issue a check to the complainant for the undisputed amount within sixty (60) calendar days of the date the agency determines the amount it believes to be due. The complainant may petition for enforcement or clarification of the amount in dispute. The petition for clarification or enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."

*2

──────────────── (Cite as: 2004 WL 1554771, *2 (E.E.O.C.)) ────────────────

5. The agency shall consider taking disciplinary action against the agency officials found to have discriminated against complainant. The agency shall report its decision. If the agency decides to take disciplinary action, it shall identify the action taken. If the agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline.

The agency is further directed to submit a report of compliance, as provided in the statement entitled "Implementation of the Commission's Decision." The report shall include supporting documentation of the agency's calculation of back-pay and other benefits due complainant, including evidence that the corrective action has been implemented.

### POSTING ORDER (G0900)

The agency is ordered to post at its Richmond, California facility copies of the attached notice. Copies of the notice, after being signed by the agency's duly authorized representative, shall be posted by the agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer at the address cited in the paragraph entitled "Implementation of the Commission's Decision," within ten (10) calendar days of the expiration of the posting period.

### ATTORNEY'S FEES (H0900)

If complainant has been represented by an attorney (as defined by 29 C.F.R. § 1614.501(e)(1)(iii)), he/she is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. § 1614.501(e). The award of attorney's fees shall be paid by the agency. The attorney shall submit a verified statement of fees to the agency -- not to the Equal Employment Opportunity Commission, Office of Federal Operations -- within thirty (30) calendar days of this decision becoming final. The agency shall then process the claim for attorney's fees in accordance with 29 C.F.R. § 1614.501.

### IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. See 29 C.F.R. § 1614.409.

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0900)

*3

──────────────── (Cite as: 2004 WL 1554771, *3 (E.E.O.C.)) ────────────────

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate

United States District Court within ninety (90) calendar days from the date that you receive this decision. In the alternative, you may file a civil action after one hundred and eighty (180) calendar days of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

For the Commission:

Carlton M. Hadden
Director
Office of Federal Operations

### NOTICE TO EMPLOYEES POSTED BY ORDER OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

#### An Agency of the United States Government

This Notice is posted pursuant to an Order by the United States Equal Employment Opportunity Commission dated _____ which found that a violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, et seq., has occurred at this facility. Federal law requires that there be no discrimination against any employee or applicant for employment because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, or PHYSICAL or MENTAL DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment. This facility supports and will comply with such Federal law and will not take action against individuals because they have exercised their rights under law.
*4

———————————— (Cite as: 2004 WL 1554771, *4 (E.E.O.C.)) ————————————

This facility was found to have violated the Rehabilitation Act when an employee encumbering a Teleservice Representative position was not provided with a reasonable accommodation forcing him to take disability retirement. The Commission has ordered payment of compensatory damages, retroactive reassignment, back-pay, with interest, and attorney's fees. This facility will ensure, via training that officials responsible for personnel decisions will abide by the requirements of all Federal equal employment opportunity laws and will not discriminate against employees on the basis of disability.
The facility will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, Federal equal employment opportunity law.
29 C.F.R. Part 1614
2004 WL 1554771 (E.E.O.C.), EEOC DOC 05A40191
END OF DOCUMENT

## History

(Showing 2 documents)

### Direct History

☐ ➡ 1   KeyCited Citation:
         **RUSSELL C. HOLLAND, COMPLAINANT, v. JO ANNE B. BARNHART,**
         **COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, AGENCY.,** 2003 WL
         22346114, EEOC DOC 01A01372 (E.E.O.C. Oct 02, 2003) (NO. APL 01A01372, AGCY SSA-
         568-93, HRNG 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X)

         *Reconsideration Denied by*

☐ H 2   RUSSELL C. HOLLAND, COMPLAINANT, v. JO ANNE B. BARNHART, COMMISSIONER,
         SOCIAL SECURITY ADMINISTRATION, AGENCY., 2004 WL 1554771, EEOC DOC 05A40191
         (E.E.O.C. Jun 29, 2004) (NO. RQST 05A40191, APL 01A01372, AGCY SSA-568-93)

© Copyright 2005 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited,
ABN 64 058 914 668, or their Licensors. All rights reserved.

2003 WL 22346114 (E.E.O.C.), EEOC DOC 01A01372
E.E.O.C.

*ON POINT*
*TELEPHONES*

*1

—————————————— (Cite as: 2003 WL 22346114, *1 (E.E.O.C.)) ——————————————

RUSSELL C. **HOLLAND**, COMPLAINANT,
v.
JO ANNE B. BARNHART, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, AGENCY.
Appeal No. 01A01372
Agency No. **SSA**-568-93
Hearing No. 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X

October 2, 2003

DECISION

Complainant filed a timely appeal from the agency's final order on the captioned complaint. In his complaint, complainant claims unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq. and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq.

The record reveals that complainant, a former Teleservice Representative (TSR) at the agency's Richmond, California facility, filed a formal EEO complaint on May 10, 1993, claiming discrimination on the bases of disability (Obsessive Compulsive Disorder and Depression) and in reprisal for prior EEO activity as evidenced by the following incidents:

(1) On March 10, 1993, the agency denied complainant's request to work "off the phones" performing non-telephone duties for two hours per day as a reasonable accommodation for his psychiatric disability; and

(2) On March 26, 1993, the agency denied complainant's request to use three hours of leave without pay (LWOP) per day as a reasonable accommodation for his psychiatric disability.

BACKGROUND

Complainant indicated that he first started to work for the agency as a TSR in 1981, and over the years earned a reputation for considerable knowledge, accuracy, and expertise. Complainant further averred that he first received treatment for his psychiatric disorders in the early 1970's, but that these disorders increased in severity, particularly during the illness and death of his mother in 1991. Complainant indicated that his symptoms consisted of intrusive ideas, excessive worries, and an uncontrollable need to check and recheck things. At work, complainant stated that because of his psychiatric disorder, he needed a few minutes of "down time" between telephone calls to go over all the data from the call, and double-check to see that he had entered it correctly into the computer. Complainant further stated that he needed some time away from the telephones when feeling overwhelmed by stress, and that his intense depression during this time period resulted in his absenteeism.

In order to address these problems, complainant's first line supervisor (S1) requested and obtained a statement from a clinical psychologist currently treating complainant (CP). This statement, dated September 4, 1991, confirmed complainant's psychiatric condition as Obsessive Compulsive Disorder and Depression. The statement further indicated that complainant was responding well to therapy and medication, and could function full-time in his position if his amount of time on the telephones could be limited, preferably alternated with periods of non-telephone work. Based on this assessment, in October 1991, S1 provided complainant with an informal accommodation whereby he could use LWOP to "go unavailable" between calls as needed, and go off the telephones for periods up to 4 hours, but return if the caller volume demanded it.

*2

—————————————— (Cite as: 2003 WL 22346114, *2 (E.E.O.C.)) ——————————————

Next, the record reflects that the agency instituted a new "800" telephone answering system in February 1992, which dramatically increased the number of calls handled at complainant's facility.

Under the new system, the TSR's, as part of a new national policy, were not to "unplug" their telephones between callers. In May 1992, when a new manager (NM) came to complainant's facility, she informed S1 to cease complainant's informal accommodation. NM instructed S1 to obtain information to ascertain what accommodation could be provided to complainant, or whether he was even capable of performing his job. In order to obtain this information, S1 again requested a medical opinion from CP.

In an opinion dated June 2, 1992, CP advised the agency that a decision as to whether or not complainant could perform the functions of his position should not be based on his performance in the prior year given the exacerbation of his symptoms due to a grief reaction and work-related stress occasioned by the new telephone system. The opinion also indicated that if the agency would accommodate complainant by employing him full-time, but decreasing his amount of phone time, his symptoms should eventually abate, and he would return to his previous high level of functioning. The opinion noted that telephone duty was particularly stressful for complainant because his disorder made it difficult for him to enter data and speak on the telephone at the same time.

In a "memorandum of discussion," S1 memorialized a June 10, 1992 discussion between herself and complainant. Therein, S1 noted that she informed complainant that management recognized that he could not be on the telephone full-time, and that a modification in his schedule, to include a change to a part-time schedule or use of LWOP, could be implemented for a three-month period as an accommodation. However, S1 told complainant that his previous informal accommodation, where 50% of his time was spent performing non-telephone duties, could not be continued because this amounted to job restructuring. S1 further indicated that she impressed upon complainant that the essential function of his job was answering telephone calls, so that the only accommodation the agency could offer was to adjust his work schedule to reduce his telephone time. S1 also noted that complainant inquired as to whether he could have one hour of downtime, such as provided to visually impaired TSR's. However, after consultation with NM, S1 declined to provide this to complainant as a reasonable accommodation.

By memorandum dated July 28, 1992, S1 replied to complainant's June 17, 1992 formal request for a reasonable accommodation, wherein he requested that his job be restructured to reduce his telephone work and that he be able to go "unavailable" between calls. In the memorandum, S1 informed complainant that this could not be done because performing other work was not an accommodation which would allow him to perform the essential function of his job, and it would have a detrimental influence on the agency's level of service in terms of the number of calls answered. Additionally, in the memorandum the agency denied complainant's request to go "unavailable" between calls, noting that this practice was contrary to national policy, and that it would result in a delay of service and reduce the number of callers served each day. However, as a reasonable accommodation, the memorandum indicates that the agency would allow him to have a part-time (6 hour per day) work schedule, and to continue its liberal approval of his leave requests and LWOP. In the memorandum, S1 notes that complainant had previously rejected these offers, but asked that he reconsider these options. The memorandum then notified complainant that the agency could not continue to provide complainant with non-telephone duties as it had for the past year. However, in recognizing that complainant would require a period of adjustment back to full phone duties, the memorandum informed complainant that the agency would provide him with one hour of downtime ("unplugged") per day. The memorandum also notified complainant that these arrangements would be in place for three months when the situation would be re-evaluated, and suggested that he consider other positions with less telephone duties should his psychiatric condition not improve adequately for him to be able to handle telephone calls on a full-time basis. Finally, S1 indicated that although the agency could not provide complainant with the exact accommodations he requested, she hoped that the options offered would allow complainant to resume his full TSR functions in the future.

*3

──────────────────────── (Cite as: 2003 WL 22346114, *3 (E.E.O.C.)) ────────────────────────

By memorandum dated November 4, 1992, S1 notified complainant that the agency could no longer provide him with non-telephone duties as a reasonable accommodation; and, because of the nature of his job, could not restructure his position to allow him to perform the essential functions. Then, on January 7, 1993, the agency placed complainant on "leave restriction."

According to a memorandum also dated January 7, 1993, S1 informed complainant that he had used virtually all of his leave, as well as 400 hours of LWOP, noting that his absences were due to his psychiatric disability. S1 further informed complainant that the agency could no longer give him an

hour per day of downtime from the telephones, because there was very little non-telephone work to assign to him, also noting the extra large number of calls expected up until April 1993. S1 further indicated that medical evidence indicated that complainant may not be able to function as a full-time TSR, and suggested that complainant consider applying for disability retirement, attaching a copy of his estimated disability retirement benefit. Alternatively, S1 offered complainant the option of working a 4-hour per day part-time schedule, detailing the type of medical information he would need to submit to support such a request. As another alternative, S1 indicated that if complainant could no longer perform as an TSR, the agency would make every effort to place him in a suitable position in terms of his disability and qualifications. However, S1 informed complainant that should he not be able to continue as a TSR, nor qualify for another position, the agency may issue him a proposal to separate due to his inability to perform the duties of his position.

Complainant filed an EEO complaint concerning the above referenced matters, which was resolved by a January 21, 1993 settlement agreement. Therein, the agency agreed to withdraw the above referenced "leave restriction," and agreed to permit complainant to work an 8-hour day, with 2-hours of LWOP as needed, pending receipt of certain medical documentation by February 26, 1993. The settlement agreement provided that upon receipt of the medical documentation, the agency would re-evaluate the need for the leave restriction.

Then, in a memorandum dated March 10, 1993, S1 notified complainant that the medical documentation [FN1] he submitted had been reviewed, but that his request for a reasonable accommodation, in the form of an 8-hour work day to include non-telephone duties and use of "unavailable mode" at the end of calls, was denied, citing the same customer service concerns as set forth in previous memoranda. However, S1 offered complainant a 6-hour per day part-time schedule, noting that the medical documentation reflected that complainant's condition would improve with less telephone time, but she specifically declined to approve complainant's request for 2-hours off the phones per day. Also, regarding complainant's request to use "unavailable mode" at the end of calls, S1 indicated that she advised complainant many times that he could place a caller on hold while he checked his work, and again suggested that he follow this procedure. Finally, S1 suggested that if complainant could not perform telephone work, he should consider applying for other positions, or taking a downgrade to a clerical position.
*4

———————————— (Cite as: 2003 WL 22346114, *4 (E.E.O.C.)) ————————————

Complainant then submitted another updated medical assessment from CP, dated March 15, 1993, indicating that complainant's symptoms greatly increased as a result of the agency's posture concerning complainant's requests for reasonable accommodations. More specifically, CP indicated that complainant's absenteeism and need for intensive psychiatric treatment were a consequence of occupational stress, and that complainant also developed a new disorder, Adjustment Disorder with mixed emotional features, because of the insensitive way management had addressed his requests for reasonable accommodations.

On March 23, 1993, complainant submitted yet another request for an accommodation to NM, asking for up to 3-hours of LWOP per day as needed. Complainant indicated that because the TSR staff was being moved on March 29, 1993, to a space with increased noise level and lack of space, this would concomitantly increase his stress level. In response, by memorandum dated March 26, 1993, NM indicated that complainant failed to present anything "new" in his March 23, 1993 request to alter the agency's previous denial for this type of an accommodation. NM advised complainant that if he could not work an 8-hour day, he would need to assume a part-time schedule, and indicated that she would no longer approve LWOP each day, although complainant could request annual or sick leave as appropriate. NM encouraged complainant to see her if he had questions.

Complainant then submitted another statement from CP, dated April 12, 1993, advising the agency that a permanent part-time schedule would not be an effective reasonable accommodation. CP advocated for complainant to use LWOP as needed, which he felt would reduce his stress and result in a better prognosis. CP further observed that complainant was highly motivated, as evidenced by his greatly improved attendance during the current year.

According to the record, complainant applied for disability retirement in May 1993, which was granted, with an effective retirement date of August 20, 1993.

PROCEDURAL HISTORY

Complainant filed the captioned complaint on May 10, 1993. On December 30, 1993, the agency issued a final decision dismissing the complaint on the grounds of mootness because of complainant's retirement. However, on appeal, the Commission reversed the dismissal and ordered the agency to undertake an investigation of the complaint. The Commission found that complainant was aggrieved in that he claimed that he filed for disability retirement only because the agency failed to provide a reasonable accommodation. The Commission also found that complainant raised a claim of constructive discharge, which the agency failed to address, finding complainant's application for retirement was filed around the time he filed the captioned complaints, and that the record showed that complainant's supervisor advised him to consider disability retirement as early as January 1993. See **Holland** v. Social Security Administration, EEOC Appeal No. 01941772 (August 19, 1994).
***5**

──────────────── (Cite as: 2003 WL 22346114, *5 (E.E.O.C.)) ────────────────

Complainant filed a "mixed case" appeal with the Merit System Protection Board (MSPB) concerning his constructive discharge claim; and, the MSPB issued an initial decision on January 16, 1996, declining jurisdiction upon its finding that complainant voluntarily retired. On February 2, 1996, complainant requested to reinstate his now "non-mixed" discrimination claim in the EEO process. The agency investigated the complaint, and at the conclusion of the investigation, the agency provided complainant with a copy of the investigative report. Complainant then requested a hearing before an EEOC Administrative Judge (AJ). Following a three-day-hearing, the case was transferred to another AJ, who rendered a decision finding that the agency violated the Rehabilitation Act, and then conducted another hearing on the issue of damages. [FN2] Specifically, the AJ determined that complainant failed to prove that the agency retaliated against him due to his prior EEO activity regarding either claim 1 or 2, or that it discriminated against him on the basis of disability regarding claim 1. [FN3] However, the AJ determined that complainant prevailed in his claim of disability discrimination regarding claim 2, and that he was entitled to an award of "make-whole" remedies, as well as compensatory damages.
Specifically, in addressing claim 2, the AJ found that complainant established a prima facie case of disability discrimination, and that the preponderance of the evidence showed that the agency acted with discriminatory animus by failing to provide complainant with a reasonable accommodation. The AJ further determined that the agency's failure to provide complainant with a reasonable accommodation resulted in complainant's constructive discharge from the agency on August 20, 1993, the effective date of his disability retirement from the agency. The AJ also found that as of July 8, 1993, the agency engaged in bad faith by failing to disclose to complainant that his TSR position was slated for an up-grade and re-structuring of duties, eliminating a good proportion of the telephone duty, finding that this re-structuring would have allowed complainant to remain in his position at the agency. Then, noting that a hearing had been conducted on the issue of damages, the AJ awarded complainant $100,000.00 in non-pecuniary compensatory damages, $23,320.00 for pecuniary compensatory damages (future medical expenses), reinstatement to his TSR position, with backpay (plus interest), and attorney's fees.
In its final decision, the agency rejected the AJ's finding of discrimination regarding claim 2, finding that the AJ erred in several respects. [FN4]
First, the agency determined that complainant was not an "individual with a disability" under the Rehabilitation Act, finding that the use of psycho tropic medications and psychotherapy improved complainant's symptoms. The agency additionally determined that the AJ erred by failing to assess the effects of these "mitigating measures."
***6**

──────────────── (Cite as: 2003 WL 22346114, *6 (E.E.O.C.)) ────────────────

Second, the agency determined that the AJ erred in finding that handling telephone calls throughout the work day was not an essential function of the TSR position, and that complainant could therefore perform the essential functions of the TSR position. Specifically, the agency argues that in reaching both conclusions, the AJ improperly substituted her judgment for that of the agency. Furthermore, the agency determined that the AJ improperly credited the testimony of complainant's witnesses over that of the agency witnesses, and improperly made credibility findings regarding hearing testimony she did not personally hear.
Third, the agency determined that the AJ erred in finding that the agency failed to provide complainant with a reasonable accommodation, arguing that it was not obligated to do so because

complainant was not entitled to the protections of the Rehabilitation Act. Alternatively, the agency
determined that its management both offered and provided certain accommodations to complainant,
albeit not the precise accommodations requested by complainant, averring that the accommodation
requested by complainant constituted an undue hardship for the agency.
Finally, the agency determined that the AJ erred in finding that complainant's disability retirement
was tantamount to a constructive discharge, averring that the AJ failed to properly consider an Initial
Decision rendered by the Merit System Protection Board (MSPB), finding that complainant's
retirement was voluntary.
On appeal, both parties submit detailed briefs setting forth arguments and evidence in support of
their positions, which will be addressed herein.

## ANALYSIS AND FINDINGS

I. Issue of the Agency's Liability for Violations of the Rehabilitation Act

A. Did the AJ err in finding that the agency violated the Rehabilitation Act when it denied
complainant's March 26, 1993 request for a reasonable accommodation?

To bring a claim of disability discrimination, complainant must first establish that he is an individual
with a disability within the meaning of the Rehabilitation Act. Under 29 C.F.R. § 1630.2(g), an
individual with a disability is one who has, has a record of, or is regarded as having, a physical or
mental impairment that substantially limits one or more of his major life activities. Major life activities
include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and working. See 29 C.F.R. § 1630.2(i). Major life activities also
include concentrating and thinking. See Fidurski v. Department of Health and Humand Services, EEOC
Request No. 0560027 (February 19, 1997). The term "substantially limits" means: unable to perform
a major life activity that the average person in the general population can perform; or significantly
restricted as to the condition, manner or duration under which an individual can perform a particular
major life activity as compared to the condition, manner, or duration under which the average person
in the general population can perform that same major life activity. See 29 C.F.R. § 1630.2(j)(1).
*7

——————————————— (Cite as: 2003 WL 22346114, *7 (E.E.O.C.)) ———————————————

Factors to be considered in determining whether an individual is substantially limited in a major life
activity include: the nature and severity of the impairment; the duration or expected duration of the
impairment; and the permanent or long-term impact, or the expected permanent or long-term impact
of or resulting from the impairment. See 29 C.F.R. §1630.2(j)(2). The Commission also must consider
any mitigating measures "both positive and negative ... when judging whether [complainant] is
"substantially limited." See Sutton v. United Airlines, 527 U.S. 471, 482 (1999); Albertsons, Inc., v.
Kirkinburg, 527 U.S. 555, 565-566 (1999); Murphy v. United Parcel Service, 527 U.S. 516, 521-523
(1999). Moreover, an individualized assessment "is particularly necessary when the impairment is one
whose symptoms vary widely from person to person." Toyota Motor Mfg., Ky, Inc., v. Williams, 122 S.
Ct. 681, 692 (2002).
On appeal, with reference to the holdings in Sutton and Murphy, and again noting the AJ's failure to
consider the effect of mitigating measures, the agency argues that complainant failed to produce
sufficient evidence to show that his mental impairment substantially limited any major life activity, to
include those specified by the AJ, i.e., the ability to "think, concentrate, and interact with others." To
the contrary, the agency noted record testimony regarding complainant's ability to converse with his
co-workers, his excellent knowledge and memory, and superior ability to handle callers' inquiries.
With reference to 29 C.F.R. §1630.2(j)(3)(i), the agency also argues that complainant failed to
produce sufficient evidence that he was substantially limited in the ability to work. Specifically, the
agency argues that complainant failed to prove that he was limited in performing "either a class of
jobs or a broad range of jobs in various classes as compared to the average person having
comparable training, skills, and ability," as opposed to an inability to perform a single, particular job.
The agency notes that five months subsequent to his retirement, complainant began work for a
private company as a "computer-assisted telephone interviewer," and further averred that
complainant failed to provide evidence of "jobs within his field of work that he is disqualified from."

**1. Is complainant an individual with a disability within the meaning of the Rehabilitation Act?**

In the present case, we find that complainant presents conclusive evidence that he suffers from Obsessive Compulsive Disorder and Dysthymia since the 1970's, and Adjustment Disorder since 1993. Moreover, based on CP's psychiatric assessments, as well as a February 18, 1993 report of psychiatric examination, we find that complainant's symptoms increased greatly in 1991. Specifically, the record reflects that after approximately eight months of intensive psychotherapy, CP referred complainant to a psychiatrist on February 5, 1991, to assess whether complainant would benefit from medication. The record shows that this psychiatrist thereafter continued to treat complainant, in conjunction with CP's on-going therapy. Additionally, we note that complainant's treating psychiatrist conducted the January 1993 psychiatric examination which is the subject of the February 18, 1993 report, and that this report also includes a description of complainant's psychiatric history as well as a current assessment of his social and industrial functioning. Accordingly, we find that the February 18, 1993 report is a highly reliable assessment of complainant's psychiatric condition.
**\*8**

---------------------------------- (Cite as: 2003 WL 22346114, \*8 (E.E.O.C.)) ----------------------------------

The report reflects that at the time of the initial referral, complainant manifested severe compulsions to include repetitive checking to see if the stove in his apartment was turned off; that the lights were turned off; that the dishes were lined up in the kitchen; that the refrigerator door was closed and that his apartment door was locked before leaving his apartment. The report further reflects that complainant was obsessively concerned about cleanliness, requiring him to minutely examine and frequently wipe off his silverware. The report indicates that these behaviors consumed a significant amount of time, and that complainant experienced considerable anxiety if he attempted to curtail his "checking" behaviors. Industrially, the report reflects that complainant frequently checked the accuracy of the information he provided to callers and entered into the computer, to include a ritual and compulsion about turning on and off the computer. In addressing complainant's Dysthymia, the report indicated that complainant reported sadness, decreased self-esteem, sleep disturbance, decreased energy and motivation, weight gain and feelings of hopelessness.

The report reflects that while complainant showed a good initial therapeutic response to fluoxetine, his symptoms became worse during the course of his mother's illness, and then her death in January 1992. The report notes that during this time while complainant's symptoms at home were under "fair to good control," he had excessive absenteeism and significantly increased symptoms at work. The report indicates that a change in medication in the autumn of 1992, had a "positive effect" on his compulsive symptoms, and psychotherapy assisted him in his grief adjustment.

However, the report reflects that upon receiving the agency's November 1992 and January 1993 memoranda, denying his requests for reasonable accommodations, coupled with management's on-going negative attitude regarding complainant's plight, complainant's symptoms greatly increased, despite continued medication and intensive psychotherapy. At the time of examination, in January 1993, complainant had poor mood with anxiety and depression, along with transient suicidal ideation. Diagnostically, the report reflects "moderate" Obsessive Compulsive Disorder and Dysthymia, as well as the development of a new additional psychiatric disorder, Adjustment Disorder with mixed emotional features, assessed as "severe." Due to the effect of work environment stressors, prognosis could not be assessed.

The report further indicates that complainant's psychiatric condition adversely affected his health and overall activities, to include restricted activities and risk of self-assaultive behaviors. The report also notes that complainant's general level of psychiatric functioning was substantially higher from September 1991 to October 1992, when workplace accommodations were in place. As a conclusion, the report indicated that complainant's condition was not static, and that all symptoms would remain at an increased level unless effective workplace accommodations were provided, noting that complainant's therapy had not progressed because of his workplace situation.
**\*9**

---------------------------------- (Cite as: 2003 WL 22346114, \*9 (E.E.O.C.)) ----------------------------------

Additionally, concerning complainant's day-to-day performance in the workplace, we find that complainant's supervisors confirm the description of the nature and severity of complainant's psychiatric disorder which is reflected in these clinical assessments. A few pertinent examples follow. In her affidavit, NM testified as follows:

When I first came to [complainant's facility], complainant's mother had died and any call he received that reminded him of his mother would put him in tears for the rest of the day. Or, complainant would get a call that because of his compulsive disorder would have him check the input screen 18 times before he would input the case. He had a hard time with the callers calling in with their problems because it made him think about his own problems or his perceived problems. These are some of the reasons his production was low.....Complainant just could not handle the pressure and the stresses of the job.

We perhaps made a lot mistakes in complainant's case, but we tried not to come down on him hard because everything we did would upset him. We did "soft-shoe" around him because of his mental disability and did not want to upset him. Every time we had a conversation with him he was unable to work for the rest of the day or would not come to work the following day. That's just how the mental disability worked and he had to mull it over a thousand times and had to know all the angles. Sometimes I did call his doctor to alert him of the things I was going to say so that if complainant called him the doctor would be aware of what had transpired. We tried to cover all bases because we didn't want him emotionally upset and tried to be very careful in the way we handled him. On a couple of occasions complainant had threatened suicide and I didn't want to take any action that would serve as a trigger to his emotional state.

S1 provided the following affidavit testimony:

Complainant would talk to me about his obsessive compulsive behavior and not being able to control re-checking things. When this happened when he was on the phones I would suggest to him to check once, check twice and when he felt he was going to check it a third time don't just hit the input key. We had discussions like this all the time. If he really got upset about something we'd go and talk in private. I always made a point to handle him specially and talk in private because he was always conscious that other people may be listening. I dealt with it the best that I could and tried to get him to understand that he didn't have to have everything perfect. He tried, I really have to give him credit......I think after he started getting notice after notice from management the pressure began to build and was slowing him down more than the work itself because in the back of his mind he always wondered what was coming next.

Anytime I wrote anything or gave anything to him, I always sat down with him and talked about it. He was upset, I remember that. In fact, when I first wrote him up in regard to his absenteeism the meetings were very emotional on his part. And as time went on every time I had to do something a little bit stiffer he got more emotional. I had learned that it could trigger his emotions, so I learned never to hand him anything without telling him about it first. If he knew in advance this was coming, he would ask me questions because we always had on-going discussion and I would tell him that nothing was finalized at that point. Because of the talking relationship we had he had enough trust in me and I felt that he should have that trust to be able to communicate with me at any time he had a need. That helped me soften things with him because sometimes things are written rather harshly. I know as a supervisor we have to do these things but also know we do not have to be so abrupt. *10

―――――――――――― (Cite as: 2003 WL 22346114, *10 (E.E.O.C.)) ――――――――――――

There were times that complainant would call in and I could tell that he was very, very down. One time he came close to threatening suicide to me and I became very alarmed. That is why it became more and more difficult for me because I had to push him from a supervisor and management point of view. I knew his condition and questioned why we were treating complainant different from everybody else with a handicap.

Furthermore, in his own hearing testimony, complainant provides the following description of the his psychiatric disorder as it afflicts him both inside and outside of the workplace:

Well, you know, a compulsive behavior would be the repetitive--the checking and rechecking of work, the repetitiveness. Obsessions. Doubting myself, self-doubt. Contamination, but not too much on that. I'm very aware of it.

There are calls that I can take and complete the actions while I'm on the phone and go to the next call. It's when a situation becomes complicated for me, meaning it--the matter may be complex, or there may be forms I may have to complete. All I can tell you is the way I start reacting.....For example, if I'm talking to someone and, you know, it's taking a bit of time, and I hear the person kind of sighing, like I wish-in my mind, I interpret it I wish he could hurry up. I would get the basic information I needed, I would release that call, let that person go, because it would start upsetting me. In other words, I was trying to release pressure from me.

[After the sick leave restriction was issued] I was very, very upset. I couldn't understand why, I couldn't understand why I would receive a memorandum such as that, when I had actually shown improvement. One thing I was doing is, I was seeing [CP] Monday mornings at 7:30. And that was for me to be able to come to work. And it was working. I had a problem with Mondays, so I started to see him Monday mornings. So, it was real devastating. I reacted very strongly to this. Emotionally, physically.

After review of the record, we find that complainant's reports of excessive worrying, intrusive thoughts, uncontrollable and repetitive checking behavior affecting numerous daily activities, poor sleep and depressed mood (to include suicidal ideation), as confirmed by both his treating psychiatrist and psychologist, as well as his supervisors, substantially affected his ability to concentrate. In reaching this conclusion, we note in particular management testimony reflecting that complainant needed to check the screen "18 times" on a call, his compulsive need to repeatedly hit the input button (requiring the intervention of his supervisor at times to interrupt this behavior), and inability to move on to the next call without first checking and re-checking his work for fear it was not perfect. Then according to complainant, if the call were "complex," or he perceived that the caller was not satisfied with the speed of his service, he experienced even more stress, and that this slowed him down even further. To compound the impact of these compulsive behaviors, the record also shows that complainant additionally experienced mood difficulties when handling either calls that would evoke his own sad memories, or responding to management criticisms of his work, which also had the effect of disrupting his concentration such that he could not focus on his assignments. In this regard, we note that the record reflects management concerns not only about "upsetting" complainant when discussing performance problems, with the need to consult with his doctors before doing so, but also concern that complainant might harm himself.

***11**

─────────────── (Cite as: 2003 WL 22346114, *11 (E.E.O.C.)) ───────────────

Therefore, based on our review of the record, to include the clinical evidence and pertinent affidavit and hearing testimony, we concur with the AJ's ultimate finding that complainant is an individual with a disability under the applicable legal standards referenced above. Specifically, we find that the record demonstrates that complainant was afflicted with two well recognized psychiatric disorders of a chronic nature for many years, and that as of the time he requested the reasonable accommodation in claim 2, his symptoms had increased and his prognosis was uncertain. We further determine that the record shows that even when dealing with a routine call, complainant had difficulty, to varying degrees, shifting his focus to go on to another call, because of his need to re-check his work. If the call was "complex" or emotionally troublesome, the record reflects that complainant would have to completely disengage to cope with the stress, sometimes for an entire day, demonstrating the total inability to maintain his concentration to successfully complete the current call, or to go on the next call. Additionally, we note that the record shows that complainant frequently required the intervention of his supervisor for the purpose of assurance and encouragement and/or to help him develop techniques to abort his repetitive checking so that he could shift his concentration to the next caller. However, we find that even this intervention appears to have been successful in only the case of the most simple routine calls. Moreover, we note that the record reflects that these compulsive checking behaviors afflicted complainant not only in the workplace, but at home as well, as described in the clinical reports of record.

Therefore, we find that complainant is substantially impaired in the major life activity of concentrating in light of the evidence that complainant has long suffered with two chronic psychiatric disorders, manifesting an array of debilitating symptoms which substantially interfered with his ability to shift his concentration from one task or activity to the next, or to maintain the needed concentration to go on to complete a single task or activity. In this regard, we further note that at the time complainant requested the reasonable accommodation at issue, his psychiatric symptoms were severe despite his use of the mitigating measures of daily psycho tropic medication and intensive psychotherapy, to include sessions every Monday morning, and up to three times per week. For these reasons, we conclude that complainant is "disabled" in the major life activity of concentrating within the meaning of the Rehabilitation Act.

Accordingly, although the AJ's analysis failed to account for the effects of complainant's mitigating measures, the Commission finds that the AJ did not err in making the ultimate finding that complainant was an individual with a disability.

2. Is complainant a qualified individual with a disability under the Rehabilitation Act?

**\*12**

──────────────── (Cite as: 2003 WL 22346114, \*12 (E.E.O.C.)) ────────────────

Next, in order to be afforded the protections of the Rehabilitation Act, complainant also must show that he is a "qualified" individual with a disability within the meaning of 29 C.F.R. § 1630.2(m). The term "qualified individual with a disability," with respect to employment, is defined as a disabled person who, with or without a reasonable accommodation, can perform the essential functions of the position held or desired. See 29 C.F.R. § 1630.2(m). The term "position" is not limited to the position held by the employee, but also includes positions that the employee could have held as a result of reassignment. Therefore, in determining whether an employee is "qualified," an agency must look beyond the position which the employee presently encumbers. See Interpretive Guidance on Title I of the Americans With Disabilities Act, Appendix. to 29 C.F.R. Part 1630.2(o).

In its final action, and on appeal, the agency again claims AJ error, and argues that the essential function of the TSR position is "constant phone availability," reflected in both its policy and practice, especially in the advent of the huge volume created by the new 800 system. The agency avers that even assuming that complainant is "disabled," because his psychiatric condition precluded him from continuously performing telephone duty on a full-time basis, he is not a "qualified" individual with a disability.

We have carefully considered the agency's arguments. Our review of pertinent agency position descriptions and performance appraisal standards for the TSR position confirms that handling incoming telephone calls is an essential function of the TSR position; however, we find that neither these documents, nor any other agency records, demonstrate that handling a certain number of calls within a specified time, or constant telephone availability, is reflected as an essential function of the TSR position. In fact, to the contrary, review of the agency's "Plug-In Procedures for Teleservice Centers" states only that TSR's remain "plugged-in" "to the extent possible" and remain on the line with a particular caller "to the extent possible," rather than mandating "continuous" uninterrupted availability for the entire shift.

Furthermore, notwithstanding the agency's arguments to the contrary, we find that even in practice, the agency did not appear to consider constant phone availability to be an essential function of the TSR position. For example, the record shows that as an accommodation, the agency allowed visually impaired TSR's to use typewriters to record data while on-line, but that they are then provided off-phone time at the end of their shift to input this data into the computer. As another example, we note that in its March 10, 1993 memorandum to complainant, as an alternative to providing him with an accommodation, the agency encouraged complainant to place callers on "hold" while inputting data and checking his work, which suggests that this procedure would be acceptable under the new "remain plugged-in" policy. However, we concur with the AJ this suggested procedure would clearly make complainant just as unavailable during this "hold" time as if he went off-line to input/check this same data, which again belies the agency's argument that constant phone availability is an essential function of the TSR position.

**\*13**

──────────────── (Cite as: 2003 WL 22346114, \*13 (E.E.O.C.)) ────────────────

Therefore, based on our review, we find that the agency's policy and practice reflect that while answering incoming calls is an essential function of the TSR position, the manner in which this function is accomplished by a TSR, as well as constant phone availability during the work day, is not itself an essential function of the TSR position. Accordingly, we concur with the AJ's finding that constant "unrelenting" telephone availability was not an essential function of the TSR position, and we find no error in this determination.

In further assessing whether complainant is "qualified" for his TSR position, we also concur with the AJ that the record demonstrates that complainant was qualified to perform as a TSR, given that he had successfully done so for many years, and with "informal" reasonable accommodations, receiving "excellent" ratings on the last three performance appraisals prior to his retirement. We note that on appeal the agency offers various explanations challenging these "excellent" ratings, to include the possible bias of S1. Nonetheless, we find that even if one of these ratings had simply been "rolled over" from a previous rating period, two supervisors concurred in the 1992 rating. Moreover, we find that the record testimony of S1, as well as that of a long-time co-worker of complainant, are each

detailed and consistent in attesting to complainant's ability to perform as a TSR, notwithstanding the agency's suggestion of bias. [FN5] In this regard, we note that the last rating issued to complainant, a progress review dated February 3, 1993, indicated that complainant was "fully" meeting the requirements of his TSR position. We also note that S1 provided the following assessment of his work in her affidavit:

I want to describe the quality of complainant's work. As far as his accuracy level and following instructions he was meticulous. ... He had the best accuracy rate in the entire unit. Although management said we were not using numerics anymore the only thing they talked about was production.. ... Whenever I did my Service Observations on complainant I never had any problems with him. I had more problems with other employees. .....the only problem was that he was slow. Accordingly, for the reasons set forth above, we find that complainant is a qualified individual with a disability, and that the AJ did not err in making this determination.

3. Did the agency fulfill its obligations under the Rehabilitation Act to provide complainant with a reasonable accommodation for his psychiatric disability?

Under the Commission's regulations, an agency is required to reasonably accommodate the known limitations of a qualified individual with a disability, unless the agency can show that accommodation would cause an undue hardship. See 29 C.F.R. § 1630.2(p); EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act (revised October 17, 2002) (Guidance). The Guidance allows an agency to choose among reasonable accommodations as long as the chosen accommodation is effective, and states that, while the preference of the individual with a disability should be given primary consideration... [the agency] has the ultimate discretion to choose between effective accommodation. See Guidance, Question 9, pp. 8-9; also see 29 C.F.R. Part 1630 app. 1630.9 (1997). Moreover, once an employer becomes aware of the need for an accommodation of an employee's disability, the employer has a mandatory obligation under the governing EEOC Regulations to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. See 29 C.F.R. § 1630.2(o)(3).
*14

─────────────── (Cite as: 2003 WL 22346114, *14 (E.E.O.C.)) ───────────────

Reasonable accommodation may include job restructuring or modified work schedules. See 29 C.F.R. § 1630.2(o). Factors to consider in determining whether any of these accommodations would impose an undue hardship include the size and budget of the program, the type of operation and the nature and cost of the accommodation. See 29 C.F.R. § 1630.2(p).
In the instant case, we find that the record demonstrates that once the agency learned of complainant's psychiatric disability, it fulfilled its duty to engage in an interactive process to address his need for a reasonable accommodation, as evidenced by its record of discussions with complainant, review of medical documentation, and written responses to complainant's requests for accommodations. However, we concur with the AJ that the agency's offer of a fixed part-time 6-hour per week schedule, in lieu of the "up to" 3 hours per day of LWOP requested by complainant, did not effectively accommodate complainant's inability to take periodic as-needed breaks from telephone work. We find that the medical evidence of record consistently states not only that complainant would benefit therapeutically from overall less telephone time, but that because of the nature and severity of his symptoms, e.g., his compulsive checking behavior and associated anxiety, he needed to take breaks away from the phones, either doing other work or simply not answering calls. Because a 6-hour part-time schedule would reduce his telephone time, but not allow for these needed intermittent breaks, we find that this is not an effective accommodation that would allow complainant to perform the essential functions of his TSR position, i.e., handling telephone calls.
Furthermore, we concur with the AJ's finding that providing complainant with the accommodation he requested in claim 2 would not result in an undue hardship to the agency, which the agency identifies as the number of unanswered calls. Specifically, we concur with the AJ that the evidence showing that the agency provided LWOP and off-phone time to other disabled employees as reasonable accommodation belies its argument that providing essentially the same accommodation to complainant, even though his off-time could not be as efficiently scheduled in terms of routing 800 calls from the agency's Baltimore facility to complainant's facility, constitutes an undue hardship. Additionally, we find that the evidence of record fails to show that the number of unanswered calls resulting from a 6-hour part-time schedule, the accommodation offered to complainant, would be

significantly less than that resulting from complainant's daily use of LWOP. Accordingly, we concur with the AJ that the record fails to demonstrate that the reasonable accommodation requested by complainant would have resulted in an undue hardship for the agency.

In conclusion, for the reasons set forth above, we find that the agency failed to comply with its obligations under the Rehabilitation Act when it denied the reasonable accommodation complainant requested in claim 2, and we find that the AJ did not err in making this determination.

B. Did the AJ err in finding that the agency violated the Rehabilitation Act in her determination that complainant's disability retirement was tantamount to a constructive discharge?

**\*15**

———————————— (Cite as: 2003 WL 22346114, \*15 (E.E.O.C.)) ————————————

It is undisputed in the record that the MSPB dismissed complainant's appeal alleging that his disability retirement was tantamount to a constructive discharge, finding that he voluntarily left the agency. Notwithstanding the agency's arguments to the contrary, we find that the "voluntary" determination by the MSPB in dismissing complainant's appeal does not preclude the EEOC from adjudicating the merits of a constructive discharge claim, nor is the Commission required to adopt this finding. Instead, under such circumstances, the Commission has held that MSPB findings are not res judicata with regard to a complainant's claim of constructive discharge. See Borghese v. Department of Defense, EEOC Request No. 05920734 (November 27, 1992), (noting also that the MSPB's standard for determining whether a complainant's resignation or retirement is voluntary is different from the Commission's standard regarding constructive discharge).

Accordingly, as an initial matter, we find that the AJ did not err in adjudicating complainant's claim of constructive discharge.

The central question in a constructive discharge case is whether the employer, through its unlawful discriminatory behavior, made the employee's working conditions so difficult that any reasonable person in the employee's position would feel compelled to resign. See Carmon-Coleman v. Department of Defense, EEOC Appeal No. 07A00003 (April 17, 2002). The Commission has established three elements which a complainant must prove to substantiate a claim of constructive discharge:

(1) a reasonable person in the complainant's position would have found the working conditions intolerable;

(2) conduct that constituted discrimination against the complainant created the intolerable working conditions; and

(3) the complainant's involuntary resignation resulted from the intolerable working conditions. See Walch v. Department of Justice, EEOC Request No. 05940688 (April 13, 1995).

In this case, we find that the record confirms that at least as of January 1993, and specifically in its January 7, 1993 memorandum, the agency informed complainant that it would not provide him with any accommodation that would allow him to have periodic breaks from telephone duty. Moreover, this memorandum communicated to complainant that because management recognized that his psychiatric condition required such breaks, he could be terminated unless he found another position or took a downgrade to a clerical position. [FN6] We further find that it is within the context of this unyielding posture, that the agency "recommends" that complainant consider disability retirement, even going so far as to provide complainant with a copy of his estimated disability retirement benefit. Continuing on this course, the record further reflects the agency's repeated denials in response to complainants numerous attempts to craft an accommodation that would meet his needs and be acceptable to the agency, insisting that complainant must remain "plugged-in" throughout his shift if he wanted to retain his position as a TSR. However, in stark contrast to the agency's steadfast refusal to accommodate complainant with periodic breaks, record testimony demonstrates that management displayed a most obliging attitude in encouraging complainant to apply for disability retirement. In fact, we find that it is likely this patronizing posture explains complainant's rather inconsistent statement in his November 27, 1995 letter to the MSPB, that while the agency did not "coerce" him into retiring, he nonetheless felt "pressured" to do so.

**\*16**

———————————— (Cite as: 2003 WL 22346114, \*16 (E.E.O.C.)) ————————————

Furthermore, we find that the likely source of this "pressure" experienced by complainant was the

choice presented by the agency: termination or disability retirement. In finding that complainant's choice was limited to these two options, we note that although the agency made occasional references to the possibility of a reassignment, it does not appear that the agency meaningfully endeavored to even ascertain whether a suitable position for reassignment existed during the time at issue. [FN7] We find that the agency had an obligation under the Rehabilitation Act to explore the possibility of a reassignment as a reasonable accommodation given its posture that no accommodation existed which would allow complainant to perform his TSR duties. See Hampton v. U.S. Postal Service, EEOC Appeal No. 01986308 (August 1, 2002); 29 C.F.R. § 1614.203(g). [FN8] Moreover, we find that the agency admits that it did not inform complainant at any time prior to his August 1993 disability retirement, that his TSR position was slated for an up-grade and restructuring to include non-telephone duties effective the very same month as his retirement. In order words, the agency did not present the restructured TSR position as a third option to complainant as an alternative to either termination or disability retirement. Furthermore, we concur with the AJ that the agency's failure to disclose this crucial information to complainant must be viewed as bad faith. Specifically, we note that the agency's rationale for failing to disclose this information is that complainant seemed happy and content with his decision to retire, and telling him about the restructuring would only serve to aggravate him. Additionally, the agency also maintains that it chose not to tell complainant about the restructuring because it did not know enough about new duties in the restructured position to accurately access if it would work as an effective reasonable accommodation. We note NM's hearing testimony that she anticipated that complainant would ask a lot of questions about the restructured position if she told him about it, and she might not be able to answer them.

After review, we find that the agency's rationale for not informing complainant about the restructured TSR position tend more to show that the agency simply did not want to bother undertaking an assessment of the restructured position as a possible reasonable accommodation, and also did not care to risk having complainant change his mind about retirement. In support of this finding, we note the statement made by NM, which she confirmed in her testimony at the damages hearing, that she hoped that complainant would take disability retirement so that the agency would not have to terminate him. We also find that while complainant may have finally resigned himself to the fact that he had to retire, we find that the acts of filing an appeal with the MSPB and an EEO complaint regarding this retirement certainly belies any agency claim that complainant was happy with his decision to retire.
*17

──────────────── (Cite as: 2003 WL 22346114, *17 (E.E.O.C.)) ────────────────

On appeal, we note that the agency also argues that its failure to disclose or discuss the option of the restructured TSR position with complainant should not be viewed as bad faith because record evidence reflects that complainant's union representative was aware of the upcoming restructuring, and similarly did not disclose it to complainant. However, there is no evidence of record to indicate how the union representative learned of the restructuring, or to suggest that the responsible management officials ever held discussions with this union representative for the purpose of exploring whether the restructured TSR position might be an option for complainant. We find that whether or not this union representative made the disclosure to complainant has no bearing on the agency's failure to do so. Therefore, for the above stated reasons, we concur with the AJ's determination that the agency engaged in bad faith by failing to present the restructured TSR position as an option to complainant prior to the effective date of his disability retirement.

For the reasons set forth above, we find that complainant chose disability retirement believing that he would otherwise be terminated. As noted by the Commission in the previous decision, complainant filed the instant complaint at about the same time he filed for disability retirement, claiming that he only applied for disability retirement because the agency refused to provide him with a reasonable accommodation which would allow him to remain employed. We find that a reasonable person, presented with such a choice, would find termination "intolerable," leaving no other recourse but to apply for disability retirement.

Accordingly, we find that the agency failed to comply with its obligations under the Rehabilitation Act when it declined to provide complainant with an effective reasonable accommodation, and that his disability retirement was a consequence of this discriminatory action, such that we conclude that the AJ did not err in finding that complainant's disability retirement was tantamount to a constructive discharge.



Conclusion on the Issue of Agency's Liability for Violations of the Rehabilitation Act

In conclusion, we find that the AJ's decision properly summarized the relevant facts and referenced the appropriate regulations, policies, and laws. We also conclude, that as a matter of law, the AJ correctly concluded that complainant demonstrated, by a preponderance of the evidence, that the agency discriminated against him on the basis of disability when it failed to provide him with an effective reasonable accommodation for his mental disability, resulting in his constructive discharge on August 20, 1993.

II Issue of the AJ's Assessment of the Amount of Damages and Award of Remedies

A. Did the AJ err in finding that the agency was liable for compensatory damages?

Pursuant to Section 102(a) of the Civil Rights Act of 1991, a complainant who establishes his or her claim of unlawful discrimination may receive, in addition to equitable remedies, compensatory damages for past and future pecuniary losses (i.e., out of pocket expenses) and non-pecuniary losses (e.g., pain and suffering, mental anguish). 42 U.S. C. §1981a(b)(3). However, complainant bears the burden in proving that the harm suffered was caused by the agency's discriminatory actions, as well as the burden of demonstrating the extent, nature, and severity of the harm, to include the duration or expected duration of the harm. See Johnson v. Department of Interior, EEOC Appeal No. 01961812 (June 18, 1998); also see Enforcement Guidance: Compensatory and Punitive Damages Available under Section 102 of the Civil rights Act of 1991, No. N 915-002 (July 14, 1992) (Guidance). *18

————————————— (Cite as: 2003 WL 22346114, *18 (E.E.O.C.)) —————————————

On appeal, while the agency does not specifically address the AJ's award of remedies, it clearly avers that it bears no liability for any of complainant's claimed violations of the Rehabilitation Act, such that it may be inferred that it disputes that complainant is entitled to any remedy whatsoever. However, as reflected above, we find that the agency discriminated against complainant on the basis of disability when it failed to provide him with a reasonable accommodation and that this act of discrimination resulted in his constructive discharge.

In her decision, the AJ determined that the agency's liability for compensatory damages was limited to only that harm which occurred subsequent to July 8, 1993, based on her post-hearing finding that the agency engaged in an interactive process in exploring reasonable accommodations for complainant up until July 8, 1993, but thereafter failed to do so, and acted in bad faith, when it did not inform complainant about the restructuring of his TSR position. We find that this determination is supported by the record.

Accordingly, we concur with the AJ that the agency is liable to complainant for compensatory damages for the harm incurred on and after July 8, 1993, which may be attributed to its discriminatory actions.

B. Did the AJ err in her $100,000.00 award of non-pecuniary damages and $26,320.00 in pecuniary damages?

In reviewing these determinations, we again note that the agency submits neither argument nor evidence to challenge the AJ's findings or conclusions of law on the issue of damages. We further find that the agency had adequate "notice" of the remedies to be awarded should the Commission's decision on appeal uphold the AJ's discrimination determination, and had an opportunity to reject or challenge in any part the award of damages in its final order, as well as on appeal. Therefore, we assume that the agency found the AJ's award to be appropriate in the event that liability had been established. Nonetheless, we undertake the following review of this matter.

1. Non-Pecuniary Compensatory Damages

In assessing the amount of non-pecuniary compensatory damages, the AJ found that the medical evidence, consisting of August 1998 statements from both CP and complainant's treating psychiatrist, confirmed that complainant experienced a "severe emotional injury" as a consequence of his

constructive discharge, and continued to experience feelings of worthlessness and low self-esteem in the 5 years that followed. Based on the severity of this harm, (exacerbation of his obsessive compulsive disorder symptoms, feelings of rejection, shame, anger, worthlessness, depression, and social isolation), and its duration (on-going for a period of at least 5 years), the AJ found that an amount of $100,000.00 was consistent with the amount awarded in similar cases. In reaching this conclusion, the AJ cited several cases with compensatory damage awards of between $75,000.00 and $100,000.00, wherein the complainant had suffered emotional harm commensurate to that suffered by complainant in the present case.
**\*19**

──────────────── (Cite as: 2003 WL 22346114, \*19 (E.E.O.C.)) ────────────────

Based on our review of the entire record, and in particular our review of the August 1998 medical opinions submitted by complainant, as well as the statements in his August 28, 1998 petition for damages, we find that the AJ properly determined that complainant is entitled to $100,000.00 in non-pecuniary damages for emotional pain and suffering as a consequence of his discriminatory constructive discharge. We note that the AJ did not specifically indicate that because complainant had a pre-existing psychiatric condition, the extent of the agency's liability was limited to the additional harm caused by its discriminatory conduct. See Guidance at 11-12. Nonetheless, based on our review, we find that the AJ's assessment of non-pecuniary damages was based on an assessment of this additional harm, as reflected in the medical statements submitted by complainant, and that the nature and severity of the additional harm incurred due to the increase in symptoms, in the context of comparable cases, warranted an award of $100,000.00.
Our determination considers the emotional symptoms described by complainant, and both of his treating doctors, and we find that the award here is not motivated by passion or prejudice, is not monstrously excessive, and is not inconsistent with amounts awarded in similar cases. See Cygnar v. City of Chicago, 865 F.2d 827, 848 (7th cir. 1989); Guidance at 13-14. Therefore, we concur in the AJ's determination that complainant is entitled to an award of $100,000.00 in non-pecuniary compensatory damages, and we find no error in this determination.

2. Pecuniary Compensatory Damages

The AJ determined that complainant requested future, but not past medical expenses, and determined that he was entitled to an award of $26,320.00 for future medical expenses. In reaching this conclusion, the AJ determined that the medical evidence submitted by complainant demonstrated that these projected expenses were related to his treatment needs in connection with those symptoms arising from the agency's post-July 8, 1993 conduct.
Based on our review, we concur with the AJ that the August 1998 medical reports reflect the need for continuing treatment of complainant because of his constructive discharge, and that complainant's petition for damages appears to accurately reflect the estimated cost of this treatment. Therefore, we concur in the AJ's determination that complainant is entitled to an award of $26,320.00 in pecuniary damages for future medical expenses, and we find no error in this determination.

B. Did the AJ err in awarding complainant the make-whole remedies of reinstatement, back-pay, and attorney's fees?

Reinstatement and Back-pay

We further find that as part of complainant's "make whole" remedy, the AJ properly determined that complainant should be reinstated to the now restructured TSR position, with all rights and privileges, as well as back-pay. Specifically, the AJ rejected complainant's petition for front pay instead of reinstatement, finding that the medical evidence demonstrated that complainant should be able to function in the restructured TSR position. In addressing back pay, the AJ determined that complainant was entitled to back-pay, with interest, from the date of his disability retirement, August 20, 1993, up until the effective date of his reinstatement, but that this amount must be offset by any wages earned by complainant during this time period. In this regard, the AJ also determined that the agency failed to show that complainant did not exercise reasonable diligence in mitigating his damages. In light of our finding of discrimination herein, we fully concur in this determination.

Attorney's Fees

**\*20**

——————————————— (Cite as: 2003 WL 22346114, \*20 (E.E.O.C.)) ———————————————

The AJ found that complainant was entitled to an award of attorney's fees and costs, and based on the finding of discrimination herein, we fully concur in this determination. However, we note that the AJ declined to issue a decision on the exact amount to be awarded, referring this determination to the agency. Although the current regulations specify that the AJ is make an award of attorney's fees when issuing a decision in favor of a complainant, in this situation, given the particular circumstances and posture of this case, we find that it would be more efficient for the agency to make this determination, as more fully set forth in the ORDER below.

Conclusion on the Issue of Damages and Award of Remedies

In conclusion, we find that the AJ's award of compensatory damages, reinstatement with back-pay and interest, and attorney's fees, was appropriate, and we fully concur with this determination.

## CONCLUSION

For the reasons set forth above, we discern no basis to disturb the AJ's decision. Therefore, after review of the record, including complainant's contentions on appeal, the agency's response, and arguments and evidence not specifically addressed in this decision, we REVERSE the agency's final order, and REMAND this case to the agency to comply with the remedial actions set forth in the ORDER below.

## ORDER

The agency is ordered to take the following remedial action:
(1) Within 30 calendar days of the date of this decision, the agency must pay non-pecuniary compensatory damages to complainant in the amount of $100,000.00 (One Hundred Thousand Dollars and no cents).
(2) Within 30 calendar days of the date of this decision, the agency must pay pecuniary compensatory damages to complainant for future medical expenses, in the amount of $26,320.00 (Twenty-Six Thousand Three Hundred Twenty Dollars and no cents).
(3) Within 30 calendar days of the date of this decision, the agency must retroactively reinstate complainant into the position of GS-8 Teleservice Representative at its Richmond, California facility, or another facility, if mutually agreed to by both the agency and complainant, retroactive to the effective date of complainant's disability retirement, August 20, 1993, with all rights, benefits, and privileges.
(4) Within sixty (60) calendar days after the date this decision becomes final, the agency shall determine the appropriate amount of back pay, with interest, and other benefits due complainant, pursuant to 29 C.F.R. § 1614.501. The complainant shall cooperate in the agency's efforts to compute the amount of back pay and benefits due, and shall provide all relevant information requested by the agency. If there is a dispute regarding the exact amount of back pay and/or benefits, the agency shall issue a check to the complainant for the undisputed amount within sixty (60) calendar days of the date the agency determines the amount it believes to be due. The complainant may petition for enforcement or clarification of the amount in dispute. The petition for clarification or enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."
**\*21**

——————————————— (Cite as: 2003 WL 22346114, \*21 (E.E.O.C.)) ———————————————

(5) The agency shall consider taking disciplinary action against the agency officials found to have discriminated against complainant. The agency shall report its decision. If the agency decides to take disciplinary action, it shall identify the action taken. If the agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline.
The agency is further directed to submit a report of compliance, as provided in the statement entitled

"Implementation of the Commission's Decision." The report shall include supporting documentation of the agency's calculation of back-pay and other benefits due complainant, including evidence that the corrective action has been implemented.

## INTERIM RELIEF (F0900)

When the agency requests reconsideration and the case involves a finding of discrimination regarding a removal, separation, or suspension continuing beyond the date of the request for reconsideration, and when the decision orders retroactive restoration, the agency shall comply with the decision to the extent of the temporary or conditional restoration of the complainant to duty status in the position specified by the Commission, pending the outcome of the agency request for reconsideration. See 29 C.F.R. § 1614.502(b).

The agency shall notify the Commission and the complainant in writing at the same time it requests reconsideration that the relief it provides is temporary or conditional and, if applicable, that it will delay the payment of any amounts owed but will pay interest from the date of the original appellate decision until payment is made. Failure of the agency to provide notification will result in the dismissal of the agency's request. See 29 C.F.R. § 1614.502(b)(3).

## POSTING ORDER (G0900)

The agency is ordered to post at its Richmond, California facility copies of the attached notice. Copies of the notice, after being signed by the agency's duly authorized representative, shall be posted by the agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer at the address cited in the paragraph entitled "Implementation of the Commission's Decision," within ten (10) calendar days of the expiration of the posting period.

## ATTORNEY'S FEES (H0900)

If complainant has been represented by an attorney (as defined by 29 C.F.R. § 1614.501(e)(1)(iii)), he/she is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. § 1614.501(e). The award of attorney's fees shall be paid by the agency. The attorney shall submit a verified statement of fees to the agency -- not to the Equal Employment Opportunity Commission, Office of Federal Operations -- within thirty (30) calendar days of this decision becoming final. The agency shall then process the claim for attorney's fees in accordance with 29 C.F.R. § 1614.501.

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

**\*22**

———————— (Cite as: 2003 WL 22346114, \*22 (E.E.O.C.)) ————————

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition

for enforcement, will be terminated. See 29 C.F.R. § 1614.409.

## STATEMENT OF RIGHTS - ON APPEAL RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:
1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or
2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.
***23**

──────────────── (Cite as: 2003 WL 22346114, *23 (E.E.O.C.)) ────────────────

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0900)

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. In the alternative, you may file a civil action after one hundred and eighty (180) calendar days of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

For the Commission:

Frances M. Hart
Executive Officer
Executive Secretariat

FN1. Complainant submitted not only an updated assessment from CP, but also a report of a psychiatric examination dated February 18, 1993.

FN2. According to the record, the AJ who conducted the hearing left the EEOC prior to issuing a decision on the complaint.

FN3. On appeal, neither party disputes these determinations. Accordingly, they will not be further addressed herein.

FN4. The agency issued its final order on November 8, 1999, the day before the Commission's revised regulations went into effect. Pursuant to the regulations in effect at that time, the agency had the option of accepting, rejecting, or modifying the decision of the AJ. The current regulations, however, provide that the decision of an AJ is binding, subject to the appeal by the parties. See 29 C.F.R. § 1614.109(i).

FN5. According to the record, S1 tended to be protective of complainant, and the long-time co-worker, who was also disabled, had filed EEO complaints and an MSPB appeal against the agency.

FN6. In this regard, we note that the agency offered to assist complainant in finding a suitable position, but the evidence fails to show that the agency actually undertook any meaningful efforts to do so.

FN7. We note that the record contains statements from certain management officials that no suitable reassignment position existed in the Region. However, to the extent that any search was undertaken for a suitable reassignment position, the record fails to reflect that this effort, or the results of this effort were ever communicated to complainant. Therefore, while we find that the record cannot support a finding of bad faith in the agency's failure to adequately explore reassignment as a reasonable accommodation, we nonetheless find, in terms of complainant's constructive discharge claim, that this possibility was not presented to complainant as a viable third option.

FN8. The agency is advised that 29 C.F.R. § 1614.203(g), which governed and limited the obligation of reassignment in the Federal sector, has been superseded and no longer applies. 67 Fed. Reg. 35732 (5/21/01), to be codified as 29 C.F.R. § 203(b). The ADA standards apply to all conduct on or after June 20, 2002, and emphasize, among other things, a broader search for a vacancy. The ADA regulations regarding reassignment can be found at 29 C.F.R. §§ 1630.2(o) and 1630.9. Additional information can be found in the Appendix to the ADA regulations and in the EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (revised October 17, 2002) at Questions 25-30. These documents are available on the EEOC's website at www.eeoc.gov.

2003 WL 22346114 (E.E.O.C.), EEOC DOC 01A01372
END OF DOCUMENT

1994 WL 741488 (E.E.O.C.), EEOC DOC 01941772

E.E.O.C.

**\*1**

──────────── (Cite as: 1994 WL 741488, \*1 (E.E.O.C.)) ────────────

Office of Federal Operations

Russell C. Holland, Appellant,
V.
Donna E. Shalala, Secretary, Department of Health and Human Services, Agency.
Appeal No. 01941772
Agency No. SSA-568-93
Aug 19, 1994

DECISION

Appellant filed an appeal with this Commission from a final decision of the agency concerning his complaint of unlawful employment discrimination in violation of 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 791 et seq. The final agency decision was dated December 30, 1993, and was received by appellant's non-attorney representative on January 10, 1994. The appeal was postmarked January 24, 1994. It is noted that the agency failed to submit a postal return receipt or other evidence that would show when appellant actually received the final agency decision. Accordingly, the appeal is deemed to be timely (see, 29 C.F.R. 1614.402), and is accepted in accordance with EEOC Order No. 960, as amended.

ISSUE PRESENTED

The issue on appeal is whether the agency properly dismissed appellant's complaint on the grounds that the issue raised therein is now moot.

BACKGROUND

Appellant, a Contact Representative with the agency's Social Security Administration, contacted an EEO Counselor on March 24, 1993, alleging that he had been discriminated against on the basis of his mental disability (obsessive-compulsive disorder; dysthymia) when he was denied reasonable accommodation. The EEO Counselor noted that appellant's doctor requested that appellant be allowed to use leave-without-pay (LWOP) and take time off from answering the telephones as needed. In addition, the EEO Counselor represented that appellant's performance had always been rated as 'excellent,' and stated that appellant had a pending workers' compensation claim. According to the EEO Counselor's report, appellant had used only 6 hours of LWOP in 1993, but used 422 hours in 1992.

Appellant subsequently filed a formal complaint, which was received by the agency on May 10, 1993. Therein, appellant stated that the denial of reasonable accommodation was also the result of reprisal discrimination. Appellant noted that, as relief, he was seeking accommodation which would enable him to continue to perform the essential functions of his position. Appellant attached a copy of a letter dated April 4, 1993, which he sent to his Congresswoman. Appellant stated that answering telephone calls aggravated his condition, noting that he has had to increase his therapy sessions. He further stated that, prior to 1988, management accommodated his condition by allowing him to perform some work other than answering telephone calls during the day. However, appellant stated that his job has become increasingly more demanding since that time, and indicated that, in January 1993, he was notified that he would not receive the one hour of 'down time' he had previously been granted. Appellant stated that if he is denied reasonable accommodation, his only options will be reassignment or disability retirement.

**\*2**

──────────── (Cite as: 1994 WL 741488, \*2 (E.E.O.C.)) ────────────

In its final decision dated December 30, 1993, the agency dismissed appellant's complaint on the

grounds that the issue raised therein is moot.1
Specifically, the agency stated that appellant retired on disability on August 20, 1993. Thus, the agency concluded that there was no reasonable expectation that the alleged violation would recur. In addition, the agency stated that the denial of reasonable accommodation did not result in appellant's losing pay or benefits, and, as such, his retirement eradicated the effects of the action complained of. On appeal, appellant contended that if he had been provided with reasonable accommodation, he would still be employed by the agency. Appellant stated that the agency's failure to accommodate his condition increased his stress level, such that he found he could not work. Appellant noted that he filed for disability retirement to prevent further harm.
The record includes numerous statements from appellant's doctor concerning his condition. Specifically, appellant was diagnosed as suffering from an obsessive-compulsive disorder accompanied by depression in September 1991. Appellant was continuing to receive treatment at the time he filed the complaint herein. Appellant's doctor requested that his position be restructured in June 1992, such that he would spend no more than six hours per day on the telephone.
It appears from the record that appellant first requested accommodation for his condition in June 1992. At that time, appellant's supervisor indicated that she could only offer appellant the use of LWOP, or approve a change to a part-time position. Appellant's supervisor indicated that answering telephone calls was an essential function of his position. After three months, appellant's request was reevaluated. Appellant's supervisor issued a memorandum on November 4, 1992, advising appellant that she could not continue to excuse appellant from answering the telephone indefinitely.
The record contains a copy of a subsequent letter from appellant's supervisor dated January 7, 1993, regarding his request for accommodation. Therein, appellant's supervisor noted that, in 1992, appellant used nearly all of his leave, as well as over 400 hours of LWOP. Appellant's supervisor further stated that, due to the high volume of calls which were expected, she would no longer be able to provide appellant with one hour off of the telephone. She noted that since it appeared appellant could no longer perform the essential functions of his position, appellant may want to consider applying for disability retirement. It appears that appellant subsequently requested that he be allowed to spend two hours off of the telephone, and to use the 'unavailable mode.' Appellant's supervisor again denied his request on March 10, 1993, stating that she was willing, however, to approve part-time employment. Appellant made an additional request for up to three hours of LWOP per day on March 23, 1993, which was denied on March 26, 1993.
*3

————————————— (Cite as: 1994 WL 741488, *3 (E.E.O.C.)) —————————————

The record reveals that appellant filed for disability retirement in May 1993. Appellant's supervisor indicated that appellant was unable to do his work, and that there was no other position to which he could be reassigned. In addition, appellant's supervisor noted that reasonable accommodation was not an option, as the agency had tried, and failed to accommodate appellant's condition.
Finally, it is noted that the record contains copies of appellant's performance evaluations for the periods from October 1989 through September 1990, May 1991 through September 1991, and June 1992 through September 1992. During each of those periods, appellant received a performance rating of 'excellent.' In addition, appellant's supervisor completed a progress review on February 3, 1993, indicating that appellant was fully meeting the requirements of his position.

## ANALYSIS AND FINDINGS

EEOC Regulation 29 C.F.R. 1614.107(e) allows for the dismissal of a complaint or allegations therein when the issues raised are moot. To determine whether the issues raised in appellant's complaint are in fact moot, it must be ascertained (1) if it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) if the interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See County of Los Angeles v. Davis, 440 U.S. 625 (1979). When such circumstances exist, no relief is available and no need for a determination of the rights of the parties is presented.
The agency asserted that since appellant has retired and is no longer employed by it, the matter in question is now moot. It is noted that, generally, in cases in which the alleged discriminatory action concerns a complainant's working conditions and has no residual effects on future employment, the complainant's retirement eradicates the effects of the action such that no further relief is available. However, in this case, appellant has also alleged that he filed for disability retirement because the

agency failed to reasonably accommodate his condition. In addition, the record reveals that appellant filed for disability retirement shortly after his complaint was filed, and appellant indicated, in his formal complaint, that retirement was one of the only options available to him if he was denied reasonable accommodation. Therefore, we find that appellant is still aggrieved with regard to the matter in question. Accordingly, the agency's decision to dismiss appellant's complaint as being moot is REVERSED, and the complaint is hereby REMANDED to the agency for further processing. The Commission notes that the agency failed to address appellant's allegation of constructive discharge. As stated, appellant specifically referred to his retirement in his formal complaint. In addition, it appears from the record that appellant's application for retirement was filed around the time of the complaint herein. Finally, the record reveals that appellant's supervisor advised him to consider disability retirement as early as January 1993. Therefore, on remand, the agency should also process appellant's allegation of constructive discharge.

ORDER (E1092)

**\*4**

──────────────── (Cite as: 1994 WL 741488, \*4 (E.E.O.C.)) ────────────────

The agency is ORDERED to process the remanded allegations in accordance with 29 C.F.R. 1614.108. The agency shall acknowledge to the appellant that it has received the remanded allegations within thirty (30) calendar days of the date this decision becomes final. The agency shall issue to appellant a copy of the investigative file and also shall notify appellant of the appropriate rights within one hundred fifty (150) calendar days of the date this decision becomes final, unless the matter is otherwise resolved prior to that time. If the appellant requests a final decision without a hearing, the agency shall issue a final decision within sixty (60) days of receipt of appellant's request. A copy of the agency's letter of acknowledgement to appellant and a copy of the correspondence that transmits the investigative file and notice of rights must be sent to the Compliance Officer as referenced below.

IMPLEMENTATION OF THE COMMISSION'S DECISION (K1092)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the appellant.

STATEMENT OF RIGHTS - ON APPEAL

RECONSIDERATION (M1092)

The Commission may, in its discretion, reconsider the decision in this case if the appellant or the agency submits a written request containing arguments or evidence which tend to establish that:
1. New and material evidence is available that was not readily available when the previous decision was issued; or
2. The previous decision involved an erroneous interpretation of law, regulation or material fact, or misapplication of established policy; or
3. The decision is of such exceptional nature as to have substantial precedential implications. Requests to reconsider, with supporting arguments or evidence, MUST BE FILED WITHIN THIRTY (30) CALENDAR DAYS of the date you receive this decision, or WITHIN TWENTY (20) CALENDAR DAYS of the date you receive a timely request to reconsider filed by another party. Any argument in opposition to the request to reconsider or cross request to reconsider MUST be submitted to the Commission and to the requesting party WITHIN TWENTY (20) CALENDAR DAYS of the date you receive the request to reconsider. See 29 C.F.R. 1614.407. All requests and arguments must bear proof of postmark and be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed filed on the date it is received by the Commission.

RIGHT TO FILE A CIVIL ACTION (R0993)

*5

————————————————— (Cite as: 1994 WL 741488, *5 (E.E.O.C.)) —————————————

This is a decision requiring the agency to continue its administrative processing of your complaint.
However, if you wish to file a civil action, you have the right to file such action in an appropriate
United States District Court. It is the position of the Commission that you have the right to file a civil
action in an appropriate United States District Court WITHIN NINETY (90) CALENDAR DAYS from the
date that you receive this decision. You should be aware, however, that courts in some jurisdictions
have interpreted the Civil Rights Act of 1991 in a manner suggesting that a civil action must be filed
WITHIN THIRTY (30) CALENDAR DAYS from the date that you receive this decision. To ensure that
your civil action is considered timely, you are advised to file it WITHIN (30) CALENDAR DAYS from the
date that you receive this decision or to consult an attorney concerning the applicable time period in
the jurisdiction in which your action would be filed. In the alternative, you may file a civil action
AFTER ONE HUNDRED AND EIGHTY (180) CALENDAR DAYS of the date you filed your complaint with
the agency, or filed your appeal with the Commission. If you file a civil action, YOU MUST NAME AS
THE DEFENDANT IN THE COMPLAINT THE PERSON WHO IS THE OFFICIAL AGENCY HEAD OR
DEPARTMENT HEAD, IDENTIFYING THAT PERSON BY HIS OR HER FULL NAME AND OFFICIAL TITLE.
Failure to do so may result in the dismissal of your case in court. 'Agency' or 'department' means the
national organization, and not the local office, facility or department in which you work. Filing a civil
action will terminate the administrative processing of your complaint.

RIGHT TO REQUEST COUNSEL (Z1092)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney,
you may request that the Court appoint an attorney to represent you and that the Court permit you
to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act
of 1964, as amended, 42 U.S.C. 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C.
791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a
request for an attorney does not extend your time in which to file a civil action. Both the request and
the civil action must be filed within the time limits as stated in the paragraph above ('Right to File A
Civil Action').

AUG 19 1994 _____ DATE Ronnie Blumenthal, Director Office of
Federal Operations

Footnote 1:

The Commission notes that the agency initially accepted appellant's complaint for processing on
August 6, 1993. In addition, prior to the issuance of the final agency decision, appellant requested a
hearing before an Administrative Judge on November 13, 1993, stating that more than 180 days had
passed since the filing of his complaint.

1994 WL 741488 (E.E.O.C.), EEOC DOC 01941772

END OF DOCUMENT