United States of America
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
San Antonio District Office

|  |  |  |
|---|---|---|
| MICHAEL L. BUESGENS, | ) | |
| Complainant | ) | |
| | ) | |
| | ) | EEOC Case No. 360-2003-08286X |
| and | ) | Agency Nos. 03-2024 |
| | ) | 03-2339 |
| | ) | 03-2446 |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| Agency | ) | |
| | ) | |

## ORDER ENTERING JUDGMENT

For the reasons stated in the enclosed decision, I hereby enter judgment in the above-captioned case for the Agency. Notice concerning the parties' appeal rights is attached.

Also enclosed, for the Agency, is a copy of the hearing record. Complainant was previously furnished a copy of the hearing transcript.

This office will hold the Commission's copy of the report of investigation and the complaint file for sixty (60) days, during which time the Agency may arrange for return of these materials. After 60 days, if no arrangements have been made, the materials will be destroyed.

DATED _January 21_ , 2004

ROBERT L. POWELL
Administrative Judge

*NTEU attorney  912-7622*

## Certificate of Service

On this date, true copies of the attached instrument were mailed to the below-named parties or their representatives. **NOTE: For timeliness purposes it will be presumed that this instrument was received within five (5) calendar days of the mailing date specified below.**

Michael L. Buesgens
500 East Stassney Ln., Apt. 1023
Austin, TX 78745
Complainant

Russell Bokelman
P.O. Box 458
Buda, TX 78610
Complainant's Representative

Erin Timmons
Office of Chief Counsel
Internal Revenue Service
4050 Alpha Road, 14th Floor
MS 2500, MSRO
Dallas, TX 75244-4203
Agency Representative

Department of the Treasury
Office of the Equal Opportunity Program
1500 Pennsylvania Ave., NW, Rm. 6071
Metropolitan Square
Washington, DC 20220

DATED _January 21_     2004

ROBERT L. POWELL
Administrative Judge

# Notice To The Parties

## To The Agency

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the Complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the Complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403 and append a copy of your appeal to your final order. See Appendix O, EEO MD-110. You also must comply with the Interim Relief regulation set forth at 29 C.F.R. 1614.505.

## To The Complainant

You may file an appeal with the Commission's Office Federal Operations when you receive a final order from the Agency informing you whether the Agency will or will not fully implement this decision. 29 C.F.R. 1614.110 (a). From the time you receive the Agency's final order, you will have thirty (30) days to file an appeal. If the Agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the Agency's 40-day period for issuing a final order. See EEO MD-110, p. 9-3. In either case, please attach a copy of the decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below and you must send a copy of your appeal to the Agency at the same time you file it with the Office of Federal Operations. You must certify, in or attached to your appeal to the Office of Federal Operations, the date and method by which you send a copy of your appeal to the Agency.

## Where To File An Appeal

All appeals to the Commission must be file by mail, hand delivery or facsimile.

**BY MAIL:**

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, DC 20036

**BY PERSONAL DELIVERY:**

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, NW
Washington, DC 20507

**BY FACSIMILE:**

Telephone No. (202) 663-7022.

NOTE: Faxes over 10 pages will not be accepted.

## Compliance With Agency Final Action

Pursuant to 29 C.F.R. 1614.504, the Agency's final action that has *not* been the subject of an appeal to the Commission or a civil action is binding on the Agency. If the Complainant believes that the Agency has failed to comply with the terms of the decision, Complainant shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the Complainant knew or should have known of the alleged noncompliance. The Agency shall resolve the matter and respond to the Complainant in writing. If the Agency has not responded to the Complainant, in writing, or if the Complainant is not satisfied with the Agency's attempt to resolve the matter, the Complainant may appeal to the Commission for a determination of whether the Agency has complied with the terms of its final action. The Complainant may file such an appeal 35 days after serving the Agency with allegations of non-compliance, but must file an appeal within 30 days of receiving the Agency's determination. A copy off the appeal must be served on the Agency and the Agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

BEFORE THE

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION


In the Matter of:                      )
                                       )
MICHAEL L. BUESGENS,                   )  EEO No.
                                       )    360-2003-08286X
                 Complainant,          )  Agency Nos. 03-2024
v.                                     )            03-2339
                                       )            03-2446
DEPARTMENT OF THE TREASURY,            )
INTERNAL REVENUE SERVICE,              )
                                       )
                 Agency.               )
                                       )

                            Room 208
                            Customer Service
                            1821 Director's Boulevard
                            Austin, Texas

                            Tuesday,
                            December 16, 2003

        The above-entitled matter came on for bench

decision, pursuant to completion of hearing.

                 BEFORE:  HON. ROBERT L. POWELL
                          Administrative Judge

                 APPEARANCES:

                 On behalf of the Complainant:

                 RUSSELL BOKELMAN
                 NTEU Steward
                 P.O. Box 458
                 Buda, Texas 78610

                 On behalf of the Agency:

                 MICHAEL SALYARDS, ESQ.
                 IRS - Department of the Treasury
                 Stop 2500 MSRO
                 4050 Alpha Road, 14th Floor
                 Dallas, Texas 75244


                 ON THE RECORD REPORTING
                     (512) 450-0342

1    ADMINISTRATIVE JUDGES'S BENCH DECISION

2         The following constitutes my bench decision in

3    EEOC case number 360-2003-08286X, Agency numbers 03-2024,

4    03-2339, and 03-2446, Michael Buesgens and Internal

5    Revenue Service.

6         I have given full and careful consideration to

7    the record of this case, including the Agency's

8    investigative file, the exhibits admitted into evidence at

9    the hearing, the testimony of the witnesses at the

10   hearing, and the arguments of the parties or their

11   representatives at the conclusion of the hearing.

12        Based on my analysis of the evidence in this

13   case, as well as the applicable law, I have determined

14   that an oral decision from the bench is appropriate.  The

15   issues I am deciding in this case are the following.

16        Issue number 1:  Was the Complainant retaliated

17   against for protected EEO activity when the Agency denied

18   Complainant's request for restoration of 71 hours of

19   annual leave?

20        Issue number 2:  Was the Complainant a

21   qualified individual with a disability for purposes of the

22   Rehabilitation Act?  Did Complainant request reasonable

23   accommodation for his disability, and did the Agency

24   effectively deny or withhold reasonable accommodation?

25        Issue number 3:  Was the Complainant subjected

1  to disparate treatment or a hostile work environment on

2  the basis of his mental disability, that being major

3  depression, or retaliated against for protected EEO

4  activity when allegedly:

5       Subparagraph A:  Beginning in February 2003 the

6  Agency threatened to place Complainant back on the

7  telephones, subparagraph B:  In March and April 2003 the

8  Agency twice denied Complainant's request to be reassigned

9  to another department, and subparagraph C:  On or about

10 April 2003 the Agency required Complainant to produce a

11 doctor's statement allowing him to return to telephone

12 duty in his GS-8 contact representative position.

13      Issue number 4:  Was Complainant discriminated

14 against or subjected to a hostile work environment based

15 on his race; white, sex; male, mental disability;

16 depression or retaliated against for protected EEO

17 activity, when allegedly on or about May 15, 2003,

18 Complainant was provided written performance feedback

19 ~~indicated -- excuse me --~~ indicating that, when dealing

20 with customers, he needed to show more tact and be more

21 courteous.

22      Subparagraph B:  On or about May 29, 2003, the

23 Agency did not take seriously Complainant's complaint that

24 a certain coworker possessed scissors at work and instead

25 merely gave him the telephone number for the Agency's

1    inspector general.

2    ~~Subparagraph~~ Issue No. 5:  If Complainant was

3    discriminated or retaliated against in regard to any of

4    the particulars alleged, what is the appropriate remedy?

5        The Complainant's theory of discrimination and

6    the law concerning that theory may be summarized as

7    follows:  Bear in mind that at all times the Complainant

8    has the burden of proving his allegations of

9    discrimination and retaliation with relevant material and

10    admissible evidence.

11        To establish a claim of hostile environment or

12    workplace harassment, Complainant must show, one, that he

13    belongs to a statutorily protected category or class; two,

14    that he was subjected to unwelcome verbal or physical

15    conduct involving the protected class; three, the

16    harassment complained of was based on the statutorily

17    protected class; four, that harassment had the purpose or

18    effect of unreasonably interfering with his work

19    performance and/or creating an intimidating, hostile, or

20    offensive working environment; and finally, five, that

21    there is a basis for imputing liability to the employer.

22        See Ornelus [phonetic] versus Department of

23    Justice, Appeal Number 01995301, a 2002 case.  The

24    harassment must be sufficiency severe or pervasive such

25    that the Complainant's conditions of employment are .

1    materially altered, and an abusive working environment is

2    created.

3         Isolated or sporadic acts of harassment are not

4    sufficient to prove hostile work environment.  What is

5    generally required is a concerted pattern of harassment so

6    excessive that the Complainant's normal work environment

7    is disrupted.

8         In assessing whether the Complainant has set

9    forth an actionable claim of harassment, the conduct at

10   issue must be viewed in the context of the totality of the

11   circumstances, considering among other things the nature

12   and frequency of offensive encounters and the span of time

13   over which the encounters occurred.

14        Simple teasing, offhand comments, and isolated

15   incidents, unless extremely serious, will not amount to

16   discriminatory changes in the terms and conditions of

17   employment.  The conduct must be both objectively and

18   subjectively offensive such that a reasonable person would

19   find the work environment to be hostile or abusive and

20   that the victim in fact did perceive it to be so.

21        The Agency then has a very light burden of

22   stating legitimate, non-discriminatory reasons for its

23   actions following which the Complainant must show that the

24   Agency's proffered reasons are pretext for discrimination.

25        See Haris [phonetic] v. Forklift Systems, Inc.,

1   114 Supreme Court 367; Burlington Industries, Inc., versus

2   Ellerth, E-L-L-E-R-T-H, 118 Supreme Court 2257; and

3   Faragher -- that's F-A-R-A-G-H-E-R - versus City of Boca

4   Raton, 118 Supreme Court 2275, a 1998 case.

5          In deciding Complainant's allegations of

6   intentional discrimination the following analytical

7   framework is employed.  Complainant has the initial burden

8   of establish a prima facie case by showing, one, that he

9   is a member of a protected category, and two, that he was

10  subjected to an adverse employment action under

11  circumstances which, left unexplained, would raise an

12  inference of discriminatory animus.

13         The Agency then must articulate legitimate non-

14  discriminatory reasons for its actions, following which

15  the Complainant must demonstrate that the Agency's

16  proffered reasons are pretext for discrimination.

17         See McDonnell Douglas Corporation versus Green,

18  93 Supreme Court 1817, a 1973 case, Texas Department of

19  Community Affairs versus Berdine [phonetic], 101 Supreme

20  Court 1089, a 1981 case, and Fernco [phonetic]

21  Construction Company versus Waters, 98 Supreme Court 2933,

22  a 1978 case.

23         Following are the basic elements of a

24  reasonable-accommodation case.  One, the Complainant must

25  prove that he is a qualified individual with a disability

1    by showing that he has an impairment, that the impairment

2    substantially limits a major life activity, and that with

3    or without reasonable accommodation he can perform the

4    essential functions of the position he occupies.

5         The Complainant also must show that he made a

6    request for reasonable accommodation that was denied.    Then

7    the burden of proof shifts to the Agency to demonstrate

8    that providing the accommodation would pose an undue

9    hardship on the operation of the Agency.

10        See 29 CFR Section 1614.203 and 29 CFR Part

11   1630.   See also EEOC enforcement guidance on reasonable

12   accommodation and undue hardship under the Americans with

13   Disabilities Act, and finally I cite the parties to Toyota

14   Motor Manufacturing Kentucky, Inc., versus Williams, 122

15   Supreme Court 681, 2002 case.

16        In deciding Complainant's allegations of

17   reprisal or retaliation, the following analytical

18   framework is employed.   Complainant has the initial burden

19   of establishing a prima facie case of reprisal by showing,

20   one, that he opposed discriminatory employment practices

21   or participated in protected EEO activity.

22        Two, the Agency was aware of his protected

23   activity.   Three, the Agency took adverse employment

24   action against him.   And four, the adverse-employment

25   action followed his protected activity within such period

1    of time that retaliatory motive can be inferred.

2                    The Agency then must articulate a legitimate

3    non-retaliatory reason for its actions.  And finally, the

4    Complainant must demonstrate that the Agency's proffered

5    reason is pretext for unlawful retaliation.

6                    See Dickerson [phonetic] versus U.S. Postal

7    Service, 01822242, a 1983 case wherein the commission

8    adopted as its formula for analyzing reprisal cases the

9    analytical formula enunciated in McDonnell Douglas

10   Corporation versus Green, 93 Supreme Court 1817, a 1973

11   case.

12                   If the Agency is able to establish a legitimate

13   non-discriminatory, non-retaliatory reason for its

14   conduct, then as the trier of fact I can dispense with the

15   normal prima facie case inquiry and proceed with a

16   determination of whether the Complainant has proven by a

17   preponderance of the evidence that the Agency's

18   explanations were a pretext for action motivated by

19   prohibited discriminatory animus.

20                   See Murphy [phonetic] v. U.S. Postal Service,

21   Appeal Number 019653-98, a 1998 case.  I find that the

22   Agency articulated legitimate non-discriminatory, non-

23   retaliatory reasons for its actions.  This case,

24   therefore, turns on the sufficiency of the evidence

25   supporting or not supporting the Complainant's claim that

1    the Agency's proffered reasons are pretext for the

2    discrimination alleged.

3         Following are highlights of the evidence I

4    considered in the findings and conclusions I made with

5    respect to the various allegations of discrimination.

6         Let me address issue number 1 that relates to

7    the allegation that the Complainant was retaliated against

8    for protected EEO activity when the Agency denied

9    Complainant's request for restoration of 71 hours of

10   annual leave.

11        I heard a great deal of testimony concerning

12   this issue, and indeed this is the central issue in this

13   whole series of disputes, or at least the evidence

14   indicates that to me.  As I understand the facts, the

15   Complainant is a seasonal employee.

16        Complainant is somewhat unique as a seasonal

17   employee in that, instead of burning up his leave or using

18   his leave as it accrues, Complainant has been accumulating

19   that leave such that during the time pertinent to this

20   complainant, Complainant had 71 hours of so-called use-or-

21   lose leave.

22        What that means is is that if the leave was not

23   used by January 11 of, I believe in this case, 2003, the

24   Complainant would have forfeited that leave.  The evidence

25   is clear that the Complainant was aware of the use-or-lose

1    leave.

2          The Complainant was aware of the pending

3    forfeiture if he did not use the leave.  The Complainant

4    in fact requested leave.  That leave apparently was

5    scheduled, but during the time the leave was scheduled to

6    be taken, Complainant was furloughed or scheduled to be

7    furloughed.

8          In an effort to avoid forfeiture, the

9    Complainant made what, under the regulations, would be a

10   premature request for restoration of leave.  The Agency

11   effectively denied the request, and when I say denied the

12   request, they made it clear to him that he was not

13   eligible for restoration of leave, because the Agency had

14   made an offer to allow him to remain in a duty status

15   during the furlough period in order to burn up the leave.

16         That offer was rejected by the Complainant,

17   because, had he accepted that offer, he would have had to

18   give up or reimburse, I guess, the State of Texas, or

19   whoever provides the unemployment compensation would have

20   to reimburse whatever monies he received in the way of

21   unemployment compensation.

22         Complainant was unwilling to do that.  As a

23   result, Complainant forfeited the 71 hours of leave.  I

24   will note in this case that although I think it probably

25   would have been a useless act, Complainant did not follow

1    the regulation in that, as far as I can determine based on

2    the evidence before me, he never actually submitted a

3    proper timely request for restoration of leave.

4           Now, I did consider the evidence from Mr.

5    Allen, who is a coworker -- well, not exactly a coworker.

6    He was an employee of the Agency that was employed in

7    another division who apparently also forfeited -- a

8    seasonal employee who also forfeited leave during this

9    period.

10          But the difference between that employee and

11   the Complainant was that, unlike the Complainant,

12   the -- Mr. Allen was never given the opportunity to burn

13   off his use-or-lose leave during the furlough period.

14   That was an oversight, apparently, on the part of the

15   Agency.

16          That being the case -- I believe it was in

17   February, in other words, after the leave was forfeited.

18   The -- Mr. Allen filed a request for restoration, which

19   the Agency granted, citing administrative error.  In other

20   words, management screwed up by not allowing Mr. Allen to

21   burn off his leave during the furlough period.  The cases

22   are just totally different.

23          Mr. Ojeda -- I considered his testimony.  Mr.

24   Ojeda, I think, made very clear -- he's the technician

25   that actually handles these kinds of issues regarding

1    restoration of leave.  After the fact -- in other words,

2    after the Agency had effectively denied restoration of

3    leave -- had informed the Complainant that, if he didn't

4    take the leave before January 11, he would forfeit it.

5            After that period Mr. Ojeda gave an advisory

6    opinion by means of an e-mail in which he indicated that

7    the leave could be restored.  Mr. Ojeda made very clear,

8    though, during his testimony at the hearing that these

9    questions are fact-intensive.  You change the facts; you

10   change the opinion.  He indicated he clearly didn't have

11   all of the facts when he issued that opinion.

12           Having said all of that, it is distressing to

13   me that the parties were unable to resolve this leave-

14   restoration issue.  As I said, I believe that this leave-

15   restoration issue is really the centerpiece of this whole

16   series of disputes that arose thereafter involving

17   squabbles with coworkers, squabbles with supervisors, and

18   so on and so forth.

19           It's highly likely that had the parties been

20   able to resolve the leave-restoration issue, then some of

21   these other issues would never have arisen or would have

22   gone away.  I think there were some reasonable compromises

23   put on the table during the parties' settlement

24   negotiations.  I just wish the parties had been more

25   willing to go the extra mile to resolve this issue.

1           But having said that, I do not find that the

2     Agency acted with discriminatory animus or bias in not

3     restoring the leave for the reasons that I just cited.

4           Let me turn to issue number 2.  This deals with

5     the issue of whether the Complainant is a qualified

6     individual with a disability.  Based on the evidence in

7     the record and particularly talking about the medical

8     evidence, I seriously question whether the Complainant's

9     impairment meets the criteria established in Toyota Motor

10    Manufacturing Kentucky Inc., versus Williams.

11          That case is found at 122 Supreme Court 681.  I

12    seriously question, as I said, whether the impairment is

13    one that affects a major life activity in a substantial

14    way.

15          But having said that, I do find that the

16    evidence shows that at the point in time that

17    Complainant's physician informed the Agency that the

18    Complainant was unable to perform telephone duties for an

19    unspecified period of time -- in other words, arguably on

20    a permanent basis -- at that point in time I do find that

21    the Agency perceived the Complainant to be disabled.

22          At that point in time, however, the Agency did

23    what it would be required to do.  Given the fact that the

24    Complainant could not perform the essential functions of

25    his position -- and telephone duty or the ability to

1    converse with customers via the telephone was at the core

2    of that particular job.

3              At that point in time the Agency was obligated

4    to find the Complainant alternative work by searching for

5    existing vacancies for which he would be qualified.   The

6    testimony I heard indicates that the Agency did exactly

7    that.

8              They did query other divisions within the

9    Agency to determine whether there were vacancies available

10   for which the Complainant would be qualified.   The report

11   back was that there were no such vacancies available.   I

12   would add at this point the Agency is not under an

13   obligation to create a position.

14             The Agency is not under an obligation to train

15   an employee for a different position.   They were able to

16   find, however, a GS-4, a lower-graded clerical position,

17   for which the Complainant apparently was qualified.   They

18   made an offer of that position to the Complainant.

19             The Complainant rejected -- refused the

20   position.   I find that under these circumstances, the

21   Agency complied with its legal obligations under the

22   Rehabilitation Act.

23             Issue number 3.   This allegation deals with the

24   Complainant being subjected, allegedly, to disparate

25   treatment or to a hostile work environment on the basis of

1    his disability, which is ~~the~~ major depression, or

2    retaliated against for protected EEO activity when

3    allegedly, in February 2003, the Agency threatened to

4    place the Complainant back on the telephones.

5            The evidence I heard indicates that this is an

6    issue that's kind of up in the air.  When the Complainant

7    rejected the offer of the GS-4 clerical position -- the

8    Complainant still occupies the GS-8 position.  That is his

9    permanent position.

10           I think it's entirely logical that the

11   Complainant rejected the offer of alternative employment.

12   His permanent position requires telephone duty.  I don't

13   find anything unreasonable at all about the Agency

14   indicating to the Complainant that, at a point in time,

15   he's going to have to go back and do telephone work. ~~or~~

16           And although there was scant evidence that the

17   Agency actually has considered at this point terminating

18   the Complainant, I mean, that's the practical effect.  If

19   you cannot perform the duties of your position, and

20   although you may always, I guess, seek medical

21   retirement -- absent that, if you can't perform your

22   duties, you ~~get to be~~ are going terminated.  That's just the

23   reality.

24           The issue or the allegation that the Agency

25   twice denied Complainant's request to be reassigned to

1    another department in March and April 2003 -- the evidence

2    I heard -- it clearly indicates that the request to

3    transfer was not related to disability.  It was related to

4    inability of the Complainant to get along with supervisors

5    and coworkers.

6        Now, there's nothing wrong with the Complainant

7    asking for a transfer, nothing wrong with that at all.

8    Indeed, that might be a perfect solution to the problem.

9    But I don't see anything discriminatory about the Agency

10   rejecting that request or denying that request.

11       I heard testimony from a series of supervisors,

12   including the third-level supervisor, Ms. Session, that

13   clearly indicated that her obligation was to keep peace

14   and harmony in the workplace and ~~-- to the extent that she~~ tried to

15   ~~could~~ work matters in-house.

16       ~~And she certainly made the determination that~~ Ms. Session

17   ~~she~~ believes she addressed the issues concerning the

18   Complainant and that no reassignment was warranted under

19   the circumstances.  I found no evidence of discrimination

20   with regard to that matter.

21       The allegation that on or about April 2003 the

22   Agency required Complainant to produce a doctor's

23   statement allowing him to return to telephone duty in his

24   GS-8 contact-representative position -- I'm still a little

25   confused by that allegation.

1      As I understand the facts, when the Complainant

2   rejected the offer of the GS-4 ~~position, the GS-4, I~~

3   ~~believe,~~ step-10 position, Complainant was astute enough

4   to realize that, if he wasn't able to perform the duties

5   of his permanent position, that being the telephone duty

6   in the GS-8 position, he would likely be facing

7   termination.

8      Given the fact that his doctor had indicated to

9   ~~management that -- or to~~ the Agency that the Complainant

10  could not perform telephone duties, I think it's entirely

11  appropriate and, in fact, very commonplace for the Agency

12  to tell ~~the~~ *an* employee that, before ~~it~~ *it* will allow ~~you~~ *him* to

13  perform the duties of ~~your~~ *his* regular position, ~~you have~~ *he had* to

14  get medical clearance.

15     In other words, *Complainant was to* ~~get a note from ~~your~~ doctor *his*

16  saying ~~you're~~ *he was* cleared to perform telephone duty, if that's

17  indeed what ~~the employee~~ *Complainant* and his physician want~~ to do~~ *od*.   So

18  I don't understand the allegation ~~that that's anything~~

19  ~~adverse~~ that the Agency did *something wrong*.

20     But to the extent that ~~that~~ occurred, those are

21  the facts, at least as I understand them.  I find no

22  discrimination with respect to that allegation.

23     Issue number 4.  This allegation is that the

24  Complainant was discriminated against or subjected to a

25  hostile work environment based on race, sex, mental

1    disability, and retaliation when the Agency provided him

2    written performance feedback indicating that when he deals

3    with customers, he needs to show more tact and be more

4    courteous.

5             I read the e-mails from the coworkers who

6    apparently overheard telephone conversations the

7    Complainant had with various customers, and counseling was

8    warranted in those circumstances.  I also heard ample

9    evidence to convince me that Complainant has a -- and I'm

10   not disparaging him at all.  I know depression and

11   anxiety -- and if indeed it's risen to the level of a

12   bipolar condition -- can result in employees, in this case

13   the Complainant, being disgruntled, being short-tempered,

14   and so on and so forth.

15            But be that as it may, if indeed the

16   Complainant is being discourteous to customers, that's

17   something management needs to pay attention to, and under

18   the circumstances, the mid-level or the mid-term

19   performance feedback was warranted.

20            The allegation that the Complainant -- or that

21   the Agency did not take seriously Complainant's complaint

22   that a coworker was threatening him with some scissors or

23   knitting needles -- there was just absolutely no evidence

24   to support that complaint, as best I can determine.

25            The Complainant himself admits that he was

1    never threatened by this individual.  Apparently, he and

2    this coworker didn't get along, but management did much

3    more than simply refer him to the IG.  Number 1, his own

4    supervisor personally called the IG to report the matter.

5          A threat of physical harm in the workplace is a

6    serious matter.  Now, I don't think there were facts to

7    support the charge in this case, but the charge was made,

8    and I think the supervisor acted appropriately in bringing

9    this to the attention of the IG.

10         In addition, as I understand the facts,

11   management actually moved the Complainant or separated the

12   Complainant from the coworker, put them at opposite ends

13   of the work area, so they wouldn't have to come into

14   contact with each other.

15         I find absolutely no merit to that allegation.

16   And, I might add, I don't find any evidence whatsoever of

17   any discrimination based on sex, based on race, in this

18   case.  Other than the fact that you may have a supervisor

19   that's female, and the Complainant's male -- other than

20   that, there's absolutely no evidence of disparate

21   treatment.

22         Nor do I find that the various allegations rise

23   to the level of hostile work environment.  It is my

24   decision that the evidence comprising the record of this

25   case is insufficient to support a finding by me that the

1   Agency discriminated against the Complainant in regard to

2   any of the particulars alleged.

3          In light of my decision, it is unnecessary for

4   me to address the issue of an appropriate remedy for the

5   discrimination alleged by the Complainant.  Prior to

6   formal issuance, this bench decision may be edited,

7   amended, or supplemented.

8          I will issue an order entering judgment in this

9   case in due course and at that time give notice to the

10  parties with instructions concerning issuance of the

11  Agency's final order, appeal rights, and other matters.

12  There being nothing further for me to decide in this case,

13  this proceeding is adjourned.  Have a good day.

14          (Whereupon, the bench decision was concluded.)

15
16
17
18      ROBERT L. POWELL
19      Administrative Judge